CHARLES W. CLAYTON, JR., and JOAN B. CLAYTON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; W. MALCOLM CLAYTON and MARY H. CLAYTON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Clayton v. Commissioner
Docket Nos. 9507-76, 9508-76.
United States Tax Court
T.C. Memo 1981-433; 1981 Tax Ct. Memo LEXIS 314; 42 T.C.M. (CCH) 670; T.C.M. (RIA) 81433; August 13, 1981. *314 Held: (1)(a) Petitioners may not depreciate certain building components separately where in prior years a composite method was used to depreciate these components and building shells. (b) Useful lives of building shells determined to be 35 years. (c) Useful lives of certain components determined. (2) Petitioners are not entitled to a demolition loss where during construction of a two-story motel building a decision was made to convert the structure into a one-story office building. (3) Reasonable compensation for petitioners' services determined. (4)(a) Petitioners' partnership is not entitled to a charitable deduction for the taxable year 1973 resulting from a transfer of land to Orange County, Florida. (b) The partnership realized ordinary income in the taxable year 1973 on the sale of land to Orange County, Florida. (5)(a) Petitioners' partnership is not entitled to a charitable contribution for the taxable year 1974 resulting from the transfer of property to the Winter Park Church of Religious Science. (b) The partnership realized ordinary income in the taxable year 1974 on the sale of land to the Winter Park Church of Religious Science. (6) Petitioners are entitled to *315 a deduction for certain abandoned land planning costs for the taxable year 1974 but not for the taxable year 1973. (7) Values of second mortgage notes received by petitioners upon the liquidation of their wholly-owned corporation determined to be 20 percent of their face amounts. (8) Petitioners did not have reasonable cause for late filing of their 1973 income tax returns. (9) Petitioners were negligent in filing their 1973 and 1974 income tax returns. Harrison Terry Slaughter and Joseph Byron Whitebread for the petitioners. Lewis J. Hubbard, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: In these consolidated cases respondent determined deficiencies and additions to the Federal income taxes of petitioners as follows: Increases
Charles W.
Clayton
Per Amended
and Joan B.
Clayton
Per Statutory Notice
Answer to
Docket No.
9507-76
of Deficiency
the Petition
Total
1973 deficiency
$ 175,339.33
$ 63,404.03
$ 238,743.36
Section
6651 (a) [1] *316 addition
8,766.97
3,170.20
11,937.17
Section
6653 (a)
addition
11,511.24
3,170.21
14,681.45
1974 deficiency
141,258.13
17,862.83
159,120.96
Section
6653 (a)
addition
7,110.52
893.14
8,003.66
Increases
W. Malcolm
Clayton
Per Amended
and Mary H.
Clayton
Per Statutory Notice
Answer to
Docket No.
9508-76
of Deficiency
the Petition
Total
1973 deficiency
$ 175,577.13
$ 62,668.71
$ 238,245.84
Section 6651 (a)
addition
8,778.86
3,133.43
11,912.29
Section 6653 (a)
addition
11,288.49
3,133.44
14,421.93
1974 deficiency
139,029.32
17,861.89
156,891.21
Section 6653 (a)
addition
6,902.52
953.10
7,855.62 Due to several concessions by both parties, the issues remaining for our determination are: (1) Whether the useful lives assigned to office buildings and motels owned by petitioners were proper under section 167 for purposes of computing depreciation deductions. (2) Whether petitioners are entitled to an abandonment loss for the taxable year 1973 under section 165 for the unsalvaged portion of a motel in construction which was converted to an office building. (3) Whether petitioners received excess compensation from their wholly-owned corporation in 1973. (4) Whether petitioners' partnership, the Eastside Land Trust, is entitled to a charitable deduction under section 170 for the taxable year 1973 resulting from a transfer of land by the partnership to Orange County, Florida, *317 for use as a public park and whether the partnership realized ordinary income on the transfer. (5) Whether the Eastside Land Trust is entitled to a charitable contribution under section 170 for the taxable year 1974 for a purported gift of certain property to the Winter Park Church of Religious Science and whether the partnership realized ordinary income on a simultaneous sale to the church. (6) Whether certain claimed expenses relating to the Cross Creek property were properly deductible by petitioners in 1974 as abandoned land planning costs and engineering fees. (7) Whether the values of second mortgage notes received by petitioners pursuant to a liquidation of Howell Hills Inc. under section 333 were less than their face amounts. (8) Whether petitioners had reasonable cause for late filing of their 1973 income tax returns. (9) Whether petitioners were negligent in filing their 1973 and 1974 returns. FINDINGS OF FACT Some of the facts have been stipulated. These facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioners, Charles W. Clayton, Jr., and Joan B. Clayton who resided in Winter Park, Florida, at the time of the filing *318 of their petition in this case, filed their joint Federal income tax returns for the taxable years 1973 and 1974 with the Internal Revenue Service Center, Chamblee, Georgia. Petitioners W. Malcolm Clayton and Mary H. Clayton who resided in Orlando, Florida, at the time of the filing of their petition with this Court, filed their joint Federal income tax returns for the taxable years 1973 and 1974 with the Internal Revenue Service Center, Chamblee, Georgia. In 1947 petitioners organized a real estate partnership known as Claytons Realty. In subsequent years the business became very successful and in 1953 the Claytons began organizing corporations to engage in various real estate projects and related ventures. Depreciation
During the years in question, petitioners owned eight office buildings and two motel complexes, each consisting of three separate buildings. Petitioners took depreciation deductions on these buildings utilizing the component method of depreciation. On their tax returns for 1973 and 1974 petitioners showed useful lives of 20 years for most of their buildings. Subsequently, petitioners amended their returns to reflect useful lives of 10 years for their buildings. *319 After an initial adverse determination by the Commissioner with respect to the useful lives of petitioners' buildings, petitioners reallocated the costs of various buildings into revised components believing that their accountant, James Johnson, had not properly allocated costs to the various components, and had failed to list several components to which costs should have been allocated. Accordingly, the petitioners' building contractor, Edward N. Fielding, who supervised construction of each building,     examined all the cost ledger cards for each of the buildings and, predominantly from memory, allocated each contractor's cost to what he believed was the proper component. A summary of costs by component was then prepared, thus revising the allocation of costs reflected on petitioners' tax returns for 1973 and 1974. The most salient features of Mr. Fielding's revision were a reduction in costs allocated to building shells and increases in allocations to building comdponents and leasehold improvements. Building shells for office buildings were assigned useful lives of 22 years while motel building shells were assigned longer lives. The following charts reflect the original and *320 revised cost allocations along with the useful lives and depreciation taken by petitioners (originally and as ultimately revised) and the corresponding data urged upon us by respondent: PROMENADE BUILDING V
(Year of Construction - 1971) COST
USEFUL LIFE
Tax
Components
Tax Return
Revised
Return
IRS
Revised
Shell
$ 456,933.49
$ 225,485.28
20
45
22
Paving & Landscape
27,976.38
33,517.73
6
10
10
Roofing
8,102.48
10
Glass & Glazing
14,239.12
10
Plumbing Rough
10,149.37
15
Plumbing Fixtures
10,149.37
10
Electrical Rough
27,824.08
15
Electrical Fixtures
18,549.39
10
Air Conditioning
21,297.13
38,422.58
6
15
15
Ceramic Tile
3,613.63
10
Elevator
8,500.00
8,700.00
10
15
15
Carpet & Flooring
10,840.06
5
TOTALS
$ 525,547.06
$ 398,753.03
LEASEHOLD IMPROVEMENTS
06/30/71
$ 8,192.56
$ 126,998.82
3
15
5
06/30/72
22,193.47
5
12/31/72
58,371.61
4,616.36
3
15
5
06/30/73
11,774.56
5
06/30/74
13,446.81
41,221.80
3
15
5
TOTALS
$ 80,010.98
$ 206,805.01
DEPRECIATION 1973
Tax Return
IRS
Revised
Building
$ 39,067.02
$ 15,875.50
$ 18,818.94
Leasehold Improvements
16,732.70
2,954.66
26,864.41
TOTALS
$ 55,799.72
$ 18,830.16
$ 45,683.35
DEPRECIATION 1974
Tax Return
IRS
Revised
Building
$ 34,067.02
$ 15,875.50
$ 18,818.94
Leasehold Improvements
23,973.83
3,851.11
30,986.59
TOTALS
$ 58,040.85
$ 19,726.61
$ 49,805.53
LEASEHOLD IMPROVEMENT *321 COST BREAKDOWN
Component
Cost
Interior Walls
$ 35,617.90
Dry Wall
44,615.08
Wallpaper
1,196.05
Painting
10,262.11
Carpet & Floor tile
18,663.76
Drapes
741.84
Millwork (cabinets & doors)
25,828.43
Accoustical board & insulation
16,723.64
Glass partition & interior glass walls
1,320.87
Air Conditioning (ducts & controls)
20,594.35
Electrical wiring & fixtures
31,240.98
TOTAL
$ 206,805.01
BURROUGHS BUILDING
(Year of Construction - 1973)
COST
USEFUL LIFE
Tax
Components
Tax Return
Revised
Return
IRS
Revised
Shell
$ 469,628.12
$ 292,212.31
20
45
22
Paving & Landscape
35,579.10
59,220.95
5
10
10
Roofing
9,723.00
9,897.92
10
15
10
Glass & Glazing
26,039.77
26,959.72
10
15
10
Plumbing Rough
11,190.98
10
15
15
Plumbing Fixtures
14,261.64
11,190.97
10
15
10
Electrical Rough
26,307.77
10
15
15
Electrical Fixtures
38,212.71
17,538.52
5
10
10
Air Conditioning
19,302.35
32,255.58
5
15
15
Ceramic Tile
5,072.51
10
Furnishing & Acc.
3,838.59
3
3
Elevator
8,700.00
8,700.00
10
15
15
TOTALS
$ 625,285.28
$ 500,547.23
LEASEHOLD IMPROVEMENTS
06/30/73
$ 14,001.82
$ 129,025.56
5
15
5
01/01/74
47,329.50
5
15
5
06/30/74
81,268.09
56,836.53
5
15
5
TOTALS
$ 142,599.41
$ 185,862.09
DEPRECIATION 1973
Tax Return
IRS
Revised
Building
$ 39,053.74
$ 12,148.35
$ 14,520.58
Elasehold Improvements
17,172.77
2,044.38
12,902.56
TOTALS
$ 56,226.51
$ 14,192.73
$ 27,423.14
DEPRECIATION 1974
Tax Return
IRS
Revised
Building
$ 48,724.64
$ 27,005.61
$ 29,041.03
Leasehold Improvements
20,393.07
4,088.75
31,488.76
TOTALS
$ 69,117.71
$ 31,094.36
$ 60,529.79
LEASEHOLD *322 IMPROVEMENT COST BREAKDOWN
Component
Cost
Interior Walls
$32,692.02
Dry Wall
43,964.04
Wallpaper
1,265.48
Painting
7,813.67
Carpet & Floor tile
8,668.98
Drapes
5,840.22
Millwork (cabinets & doors)
22,813.16
Accoustical board & insulation
14,677.00
Glass partition & interior glass walls
Air conditioning (ducts & controls)
15,177.73
Electrical wiring & fixtures
32,949.79
Telephone & sound
TOTAL
$ 185,862.09
AMBASSADOR BUILDING
(Year of Construction - 1972) COST
USEFUL LIFE
Tax
Components
Tax Return
Revised
Return
IRS
Revised
Shell
$ 455,420.92
$ 242,879.03
20
45
30
Paving & Landscape
17,800.00
35,715.73
5
10
10
Roofing
8,703.00
12,485.00
10
15
10
Glass & Glazing
31,750.00
32,504.26
8
15
10
Plumbing Rough
7,830.83
10
15
15
Plumbing Fixtures
17,475.00
7,830.82
10
15
10
Electrical Rough
34,778.06
10
15
15
Electrical Fixtures
16,311.24
23,185.37
10
10
10
Air Conditioning
53,764.00
46,736.96
5
15
15
Ceramic Tile
3,670.36
10
Furnishing & Acc.
7,563.88
5
5
Elevator
8,091.00
8,720.00
10
15
15
Railing & Acc.
6,488.21
5
15
TOTALS
$ 623,367.25
$ 456,336.42
LEASEHOLD IMPROVEMENTS
01/01/73
$ 1,435.29
$ 101,765.57
3
15
5
06/30/73
44,495.33
49,864.45
3
15
5
12/31/73
61,766.52
5
06/30/74
17,241.43
3,474.16
3
15
5
12/31/74
13,406.18
5
TOTALS
$ 63,172.05
$ 230,276.88
DEPRECIATION 1973
Tax Return
IRS
Revised
Building
$ 48,127.34
$ 22,028.68
$ 24,138.36
Leasehold Improvements
7,977.18
3,185.62
25,291.71
TOTALS
$ 56,104.45
$ 25,214.30
$ 49,430.07
DEPRECIATION 1974
Tax Return
IRS
Revised
Building
$ 48,127.34
$ 22,028.68
$ 24,138.36
Leasehold Improvements
18,349.96
3,760.33
42,978.87
TOTALS
$ 66,477.30
$ 25,789.01
$ 67,117.23
LEASEHOLD *323 IMPROVEMENT COST BREAKDOWN
Component
Cost
Interior Walls
$ 44,855.10
Dry Wall
43,623.84
Wallpaper
3,079.13
Painting
9,497.53
Carpet & floor tile
21,779.32
Drapes
6,005.23
Millwork (cabinets & doors)
30,766.86
Accoustical board & insulation
19,467.99
Glass partition & interior glass
walls
241.85
Air conditioning (ducts & controls)
8,724.45
Electrical wiring & fixtures
39,558.65
Telephone & sound
1,018.16
Other
1,658.77
TOTAL
$ 230,276.88
CLAYTON BUILDING
(Year of Construction - 1973) COST
USEFUL LIFE
Tax
Components
Tax Return
Revised
Return
IRS
Revised
Shell
$ 386,571.21
$ 188,937.38
20
45
22
Paving & Landscape
17,220.40
26,156.05
5
10
10
Roofing
6,377.00
6,377.00
10
15
10
Glass & Glazing
27,875.00
28,348.72
10
15
10
Plumbing Rough
5,658.41
10
15
10
Plumbing Fixtures
9,300.00
5,658.40
10
15
10
Electrical Rough
24,077.31
5
15
10
Electrical Fixtures
16,706.00
16,051.54
5
10
10
Air Conditioning
16,274.81
26,929.24
5
15
10
Ceramic Tile
3,279.42
10
Furnishing & Acc.
1,851.11
3
3
Elevator
8,700.00
8,725.00
10
15
10
Telephone System
17,303.58
5
5
Sound System
1,362.40
5
5
Railings
5,405.92
10
15
TOTALS
$ 514,947.43
$ 340,198.47
LEASEHOLD IMPROVEMENTS
06/30/73
$ 19,628.35
$ 175,514.43
3
15
5
06/30/74
7,980.25
23,936.55
3
15
5
TOTALS
$ 27,608.60
$ 199,450.98
DEPRECIATION 1973
Tax Return
IRS
Revised
Building
$ 50,129.03
$ 21,262.19
$ 19,944.12
Leasehold Improvements
6,542.79
654.29
17,551.44
TOTALS
$ 56,671.82
$ 21,916.48
$ 37,495.56
DEPRECATION 1974
Tax Return
IRS
Revised
Building
$ 36,501.79
$ 21,262.19
$ 19,944.12
Leasehold Improvements
3,947.15
1,574.57
37,496.55
TOTALS
$ 40,448.94
$ 22,836.76
$ 57,440.67
LEASEHOLD *324 IMPROVEMENT COST BREAKDOWN
Component
Cost
Interior Walls
$ 22,365.96
Dry Wall
30,835.12
Wallpaper
4,095.52
Painting
5,629.37
Carpet & floor tile
18,118.72
Drapes
4,107.86
Millwork (cabinets & doors)
44,972.96
Accoustical board & insulation
15,711.68
Glass partition & interior glass walls
Air conditioning (ducts & controls)
11,541.11
Electrical wiring & fixtures
26,752.58
Telephone & sound
15,320.10
TOTAL
$ 199,450.98
HANCOCK BUILDING
(Year of Construction - 1969) COST
USEFUL LIFE
Tax
Components
Tax Return
Revised
Return
IRS
Revised
Shell
$ 164,672.12
$ 93,008.84
20
45
22
Paving & Landscape
8,507.25
10,381.19
10
10
10
Roofing
5,105.55
10
15
10
Glass & Glazing
13,676.97
10
15
10
Plumbing Rough
2,722.96
10
15
10
Plumbing Fixtures
2,722.96
10
15
10
Electrical Rough
12,338.60
10
15
10
Electrical Fixtures
8,225.74
5
10
10
Air Conditioning
29,750.00
11,572.58
5
15
10
Ceramic Tile
2,414.64
10
Furnishing & Acc.
7,361.00
5
5
Elevator
8,015.00
8,015.00
10
15
10
Partitions
18,935.00
6
6
TOTALS
$ 237,240.37
$ 170,185.03
LEASEHOLD IMPROVEMENTS
1969
$ 13,770.00
$ 58,271.00
5
15
5
12/31/70
10,713.21
5
15
5
01/01/73
11,841.13
5
15
5
TOTALS
$ 13,770.00
$ 80,825.34
DEPRECIATION 1973
Tax Return
IRS
Revised
Building
$ 15,672.87
$ 6,420.00
$ 7,712.64
Leasehold Improvements
4,587.40
701.46
14,360.78
TOTALS
$ 20,260.27
$ 7,121.46
$ 22,073.42
DEPRECIATION 1974
Tax Return
IRS
Revised
Building
$ 7,817.17
$ 3,615.56
$ 7,712.64
Leasehold Improvements
3,830.20
701.46
14,360.78
TOTALS
$ 11,647.37
$ 4,317.02
$ 22,073.42
LEASEHOLD *325 IMPROVEMENT COST BREAKDOWN
Component
Cost
Interior Walls
$ 13,502.31
Dry Wall
16,250.42
Wallpaper
953.10
Painting
3,312.04
Carpet & floor tile
6,703.50
Drapes
1,667.93
Millwork (cabinets & doors)
11,802.61
Accoustical board & insulation
6,639.96
Glass partition & interior glass walls
1,400.00
Air conditioning (ducts & controls)
5,583.60
Electrical wiring & fixtures
13,009.87
TOTAL
$ 80,825.34
LEE PARKWAY BUILDING
(Year of Construction - 1973) COST
USEFUL LIFE
Tax
Components
Tax Return
Revised
Return
IRS
Revised
Shell
$ 113,272.34
$ 95,480.80
20
45
22
Paving & Landscape
10,998.75
12,249.13
5
10
10
Roofing
10,040.00
10,040.00
10
15
10
Glass & Glazing
6,221.38
10
Plumbing Rough
3,886.38
10
15
15
Plumbing Fixtures
3,972.50
3,886.39
10
15
10
Electrical Rough
9,522.43
15
Electrical Fixtures
6,348.29
10
Air Conditioning
2,203.62
7,943.52
5
15
15
Ceramic Tile
307.42
10
Furnishing & Acc.
2,197.76
3
3
TOTALS
$ 142,684.97
$ 155,885.74
LEASEHOLD IMPROVEMENTS
01/01/73
$ 5,914.24
$ 13,228.83
5
15
5
06/30/74
61,887.81
43,874.61
5
15
5
TOTALS
$ 67,802.05
$ 57,103.44
DEPRECIATION 1973
Tax Return
IRS
Revised
Building
$ 11,083.53
$ 5,391.54
$ 8,865.08
Leasehold Improvements
2,759.82
394.28
2,645.77
TOTALS
$ 13,843.35
$ 5,785.82
$ 11,510.85
DEPRECIATION 1974
Tax Return
IRS
Revised
Building
$ 10,615.43
$ 5,391.53
$ 8,865.08
Leasehold Improvements
12,286.04
4,520.13
7,033.23
TOTALS
$ 22,901.47
$ 9,911.66
$ 15,898.31
LEASEHOLD *326 IMPROVEMENT COST BREAKDOWN
Component
Cost
Interior Walls
$ 8,226.01
Dry Wall
11,812.54
Wallpaper
2,040.01
Painting
2,226.81
Carpet & Floor tile
3,770.80
Drapes
45.00
Millwork (cabinets & doors)
9,874.11
Accoustical board & insulation
4,205.80
Glass partition & interior glass walls
195.76
Air conditioning (ducts & controls)
3,404.37
Electrical wiring & fixtures
10,580.48
Telephone & sound
Other
721.75
TOTAL
$ 57,103.44
DIPLOMAT BUILDING
(Year of Construction - 1969) COST
USEFUL LIFE
Tax
Components
Tax Return
Revised
Return
IRS
Revised
Shell
$ 323,582.75
$ 197,305.00
20
45
22
Paving & Landscape
17,155.00
17,868.53
10
10
10
Roofing
19,254.80
10
15
10
Glass & Glazing
24,849.80
10
15
10
Plumbing Rough
7,530.00
10
15
15
Plumbing Fixtures
7,530.00
10
15
10
Electrical Rough
27,281.40
10
15
15
Electrical Fixtures
18,187.60
5
10
10
Air Conditioning
48,900.00
35,368.52
5
15
15
Ceramic Tile
3,347.51
10
Furnishing & Acc.
11,655.00
5
5
Elevator
8,280.00
8,280.00
10
15
15
Partition
32,204.00
6
6
TOTALS
$ 441,776.75
$ 366,803.16
LEASEHOLD IMPROVEMENTS
1970 - 1971
$ 38,909.08
$ 113,882.67
5
15
5
TOTALS
$ 38,909.08
$ 113,882.67
DEPRECIATION 1973
Tax Return
IRS
Revised
Building
$ 21,615.81
$ 10,661.00
$ 16,170.89
Leasehold Improvements
3,865.29
324.43
13,323.78
TOTALS
$ 25,481.10
$ 10,985.43
$ 29,494.67
DEPRECIATION 1974
Tax Return
IRS
Revised
Building
$ 21,224.18
$ 10,269.34
$ 16,170.89
Leasehold Improvements
244.31
324.43
13,323.78
TOTALS
$ 21,468.49
$ 10,593.77
$ 29,494.67
LEASEHOLD *327 IMPROVEMENT COST BREAKDOWN
Component
Cost
Interior Walls
$ 9,795.20
Dry Wall
21,612.32
Wallpaper
1,082.13
Painting
7,473.55
Carpet & floor tile
21,101.49
Drapes
1,359.13
Millwork (cabinets & doors)
15,767.23
Accoustical board & insulation
9,385.49
Glass partition & interior glass walls
487.29
Air conditioning (ducts & controls)
8,403.20
Electrical wiring & fixtures
1,031.68
Sprinkler & landscaping
8,674.80
Labor
7,709.16
TOTAL
$ 113,882.67
HOWARD JOHNSONS BUILDINGS 4, 5, AND 6
COST
USEFUL LIFE
Tax
Component
Tax Return
Revised
Return
IRS
Revised
Shell
$ 1,369,888.89
$ 517.005.40
20
40
25
Built-in & Other
Furnishings
418,625.44
5
15
Leasehold Improvements
27,600.00
3
15
Paving
67,679.82
10
Roofing
28,351.91
10
Glass & Glazing
58,266.05
10
Plumbing Rough
84,953.94
15
Plumbing Fixtures
84,953.94
10
Electrical Rough
89,825.48
15
Electrical Fixtures
59,883.66
10
Elevator
8,702.00
15
Heat & Air (Central)
52,362.05
15
Air Conditioning (Room) *
61,167.37
5
Ceramic *
32,093.01
10
Carpet & Hall Tile *
65,613.61
5
Interior Walls
285,657.09
25
Trim Carpentry *
38,199.74
10
Pool
26,642.32
12
Wallpaper *
31,973.99
5
Painting (Interior) *
19,655.32
3
Furniture & Fixtures *
131,427.52
3
Mattresses *
26,185.12
5
Electrical Applicances *
4,987.88
5
Sound Equipment
15,778.54
5
Landscape, Plants
& Irrigation
15,814.68
10
TOTALS
$ 1,816,144.33
$ 1,807,180.44
*328 DEPRECIATION 1973
Tax Return
IRS
Revised
$ 176,653.06
$ 40,664.02
$ 132,750.33
DEPRECIATION 1974
Tax Return
IRS
Revised
$ 145,439.14
$ 42,504.02
$ 110,528.68
DIPLOMAT MOTEL BUILDING #1
(Year of Construction - 1970) COST
USEFUL LIFE
Tax
Component
Tax Return
Revised
Return
IRS
Revised
Shell
$ 379,346.36
$ 160,781.10
20
40
33
Built-in & Other
45,328.21
5
15
Paving
25,786.86
10
Roofing
4,037.70
10
Glass & Glazing
11,829.20
10
Plumbing Rough
17,533.18
15
Plumbing Fixtures
17,533.17
10
Electrical Rough
27,655.30
15
Electrical Fixtures
18,436.87
10
Heat & Air (Central)
4,529.27
15
Air Conditioning (Room)
21,017.10
5
Ceramic
7,880.14
10
Carpet & Hall Tile
5,757.38
19,036.03
5
5
5
Interior Walls
82,420.88
33
Pool
10,862.56
10,391.16
10
10
15
Wallpaper
2,674.99
5
Painting (Interior)
6,450.00
3
Furniture & Fixtures
70,818.15
46,234.19
6
6
5
Mattresses & Linens
10,031.32
8,698.37
3
3
5
Electrical Applicances
23,848.00
5
Sound Equipment
2,025.60
10
Landscape, Plants &
Irrigation
41,617.11
5,860.50
10
10
Lift Station
8,435.88
6,950.08
5
5
5
Signs
15,140.07
5
Drapes
10,113.44
5
TOTALS
$ 572,196.97
$ 556,863.20
DEPRECIATION 1973
Tax Return
IRS
Revised
$ 34,355.04
$ 22,468.78
$ 46,817.30
DEPRECIATION 1974
Tax Return
IRS
Revised
$ 43,791.56
$ 22,242.42
$ 48,680.69
DIPLOMAT MOTEL *329 BUILDING #2 & #3
(Years of Construction-Building #2-1972; Building #3-1973) COST
USEFUL LIFE
Tax
Component
Tax Return
Revised
Return
IRS
Revised
Shell
$ 569,121.69
$ 274,843.31
20
40
33
Built-In & Other
129,246.31
5
15
Paving
16,362.75
58,695.18
3
10
10
Roofing
19,111.05
10
Glass & Glazing
72,086.05
10
Plumbing Rough
81,178.98
47,081.96
10
15
15
Plumbing Fixtures
47,081.96
10
Electrical Rough
52,410.13
15
Electrical Fixtures
34,047.35
10
Air Conditioning (Room)
83,350.65
49,491.61
5
15
5
Ceramic
14,769.88
10
Carpet & Hall Tile
24,318.62
18,200.50
3
3
5
Interior Walls
140,359.34
33
Pool
1,471.84
15
Wallpaper
16,822.04
5
Painting (Interior)
14,602.79
3
Furniture & Fixtures
53,525.03
93,058.89
5
5
5
Mattresses & Linens
18,427.84
15,546.14
3
3
5
Electrical Applicances
2,078.44
5
Sound Equipment
53,638.37
53,794.30
5
5
10
Landscape, Plants &
Irrigation
6,350.00
5,920.78
5
10
Lift Station
543.47
5
Signs
3,456.33
6,932.00
5
5
5
Drapes
27.56
5
TOTALS
$ 1,038.976.57
$ 1,038.976.57
DEPRECIATION 1973
Tax Return
IRS
Revised
$ 119,965.17
$ 73,078.83
$ 95,271.24
DEPRECIATION 1974
Tax Return
IRS
Revised
$ 103,939.78
$ 71,554.76
$ 95,271.24
With respect to an office building called the Corporate Square Building which was constructed in 1961, petitioners claimed the following: CORPORATE SQUARE BUILDING
(Year of Construction *330 - 1961) Prior
TP
Component
Cost
Depr.
Life
Corporate Square: Building
1961
$ 283,176.89
$ 197,517.20
10
Fixtures
AC
41,489.00
35,541.63
5
Partitions
1962
7,100.00
6,718.73
4
Compartments
409.79
390.03
4
Partition
Blinds
966.03
896.73
4
Partition
Blinds
1963
923.45
833.00
4
Partition
Blinds
1964
8,104.40
8,104.40
4
Elevator
7,989.60
7,046.13
4
Improvements
208,861.63
153,174.03
10
Roofing
7,279.40
6,324.70
4
Leasehold
Imp. 1970
77,251.32
38,625.65
5
Leasehold
Imp. 1971
21,065.73
6,319.72
5
See RAR
Total
$ 664,617.24
$ 461,491.95
Claimed Depr.
Component
1973
1974
Corporate Square: Building
1961
$ 10,707.46
$ 10,707.46 Fixtures
AC
$1,992.45
1,982.45 Partitions
1962
190.64
190.63 Compartments
9.89
9.87 Partition
Blinds
34.64
34.64 Partition
Blinds
1963
45.23
45.22 Partition
Blinds
1964
Elevator
471.74
471.73 Improvements
6,960.61
6,960.61 Roofing
477.36
477.36 Leasehold
Imp. 1970
15,450.26
15,450.26 Leasehold
Imp. 1971
4,213.15
4,213.15 See RAR
* (90.00)
Total
$ 40,543.43
$ 40,453.38 The Promenade Office Building is a structural steel framework-type building with pre-stressed concrete slabs for the second floor and roof. The burroughs, Ambassador, Clayton, Hancock, and Diplomat Office Buildings each have a reinforced masonry exterior *331 wall with a structural steel framework for the interior structure. The roofs of these buildings are flat and are made of rock and gravel. The Lee Parkway Building has three walls which are reinforced masonry. One entire wall is a frame wall with glass and a concrete tie beam at the second floor and the roof level. It also has a wood store front which deteriorates more quickly than an aluminum store front. The Corporate Square Building is a five story structural steel building with masonry curtain walls. The Diplomat Motel is composed of three two-story motel buildings. They are reinforced masonry buildings whose second floor is made of pre-stressed concrete slabs with a one-inch concrete topping. In Building One there is a central hall on the first and second floors. Buildings Two and Three are entered from an outside walkway. Howard Johnson's Buildings numbers four, five, and six are composed of reinforced masonry exterior walls and party walls between the various room units. The second floor is made of pre-stressed concrete slabs with a one inch concrete topping. In constructing their office buildings, the petitioners erected the framework of the building, weatherproofed *332 it, installed the electrical, heating, and air conditioning units, built center hallways and provided elevators. All other additions, including interior walls, wallpaper, paint, carpets, paneling, floor tiles, drapes, insulation and other leasehold improvements were installed pursuant to the requirements of particular tenants. In petitioners' office buildings, the majority of tenants' leases were for a term of 3 years or less. In fact, almost all tenants had leases of a 5-year duration or less. In order to attract and maintain tenants, petitioners found it necessary to incur remodeling expenses at the end of each lease term. Approximately 70 percent of the improvements made by petitioners for a lessee were not salvageable upon the introduction of a new tenant. Where a tenant would renew his lease, generally the lessee would make significant requests for additional and substitute improvements, thus necessitating the scrapping of many of the previously installed improvements. In 1962, each petitioner created an irrevocable inter vivos trust for the benefit of his children by the transfer of certain property to the Citizens National Bank of Orlando as trustee. Petitioners retained *333 the right to remove the trustee and appoint another corporate trustee. A number of the buildings built by petitioners and involved in the present controversy were gifted by petitioners to the trusts and then leased back from the trusts by petitioners or their wholly-owned corporation for periods of 44 to 50 years. Petitioners' motels and office buildings are located north of Orlando, Florida. The construction of Walt Disney World in 1971 resulted in a tremendous enoconomc boom in Central Florida. There was a great increase in hotel and motel construction, followed by construction of numerous office buildings. However, because of a previously slow rate of economic growth and low incomes in the area in relation to national averages, the increased growth rate could not be sustained over the long-term, resulting in a "bust" in 1973 and 1974. The hotel occupancy rate in the area which had been 72 percent in 1972 dropped to 45.9 percent in 1974. The abundance of office space also caused a reduction in the rate of office occupancy. However, a slight recovery from those conditions was realized in subsequent years. The Disney World complex is a prime resort area located to the southwest *334 of the Orlando metropolitan area. Since its completion it has attracted the bulk of hotel and motel patrons in Central Florida. Petitioners' motels were located north of Orlando and 25-30 miles from the Disney complex. This geographical disadvantage coupled with the boom/bust phenomenon in Central Florida resulted in increased vacancies and a decline in room rates. The problem was further aggravated by spiraling fuel costs. The buildings owned by petitioners were constructed prior to the Arab Oil Embargo of 1973. Thus, some of the designs do not promote energy conservation. For example, glass windows were not screened or plated, thus escalating costs through increased use of air conditioning. The contractors responsible for building the roof on petitioners' buildings issued only a 10-year quarantee because of weather conditions (mainly heat and rain) in the Central Florida area. Most of the roofs on petitioners' buildings were flat and thus were subject to deterioration caused by standing water. The carpeting in petitioners' buildings wore out approximately 5 years after it had been installed. Additionally, it was difficult to salvage carpeting upon the introduction of a *335 new tenant into an office building due to the extensive remodeling of offices requested by new tenants. Some of the petitioners' office buildings and motels are subject to serious ingress and egress problems. For example, the Orlando Executive Park has only one entrance. Another access road was closed by the County Road Commission. These problems have added to petitioners' woes in maintaining and attracting tenants and guests. In 1974 petitioners engaged Mr. William C. Smith, a member of the American Institute of Real Estate Appraisers, to perform an appraisal of the Corporate Square office building. Among the findings in his report, Mr. Smith indicated that the useful life of the building was 40 years as of 1974. The building had been built in three stages, beginning in 1960 and ending in 1965. In 1975, respondent performed a study on the various types of depreciable buildings in the Southeast Region and an analysis of petitioners' claimed depreciation. That analysis showed the composite life of buildings as determined by using petitioners' depreciation schedules and the composite lives as determined by respondent's agents and engineers. The following reflects the composite *336 lives based on the initial and revised depreciation schedules for petitioners and the lives as determined by respondent: [2]
Building
Composite Life (Years)
Petitioners
Initial
Revised
Promenade
9.97
9.56
Burroughs
9.87
10.37
Ambassador
9.79
9.51
Clayton
11.14
9.02
Hancock
12.90
9.59
Lee Parkway
6.37
10.50
Diplomat
11.90
10.50
Howard Johnson
4, 5, 6
17.99
13.75
Diplomat Motel 1
15.22
10.39
Diplomat Motel 2
13.18
12.91
Diplomat Motel 3
11.32
12.91
Composite Life (Years)
Respondent
Revenue Agent
Engineers
Promenade
26.99
33.56
Burroughs
22.72
33.05
Ambassador
24.80
32.86
Clayton
23.48
33.55
Hancock
24.78
29.23
Lee Parkway
21.15
29.44
Diplomat
21.93
30.37
Howard Johnson
4, 5, 6
38.73
33
Diplomat Motel 1
40.00
33
Diplomat Motel 2
26.67
31.11
Diplomat Motel 3
21.29
27.07
In *337 addressing the lives of petitioners' building shells, respondents' study indicated that the proper useful lives for most shells were 45 years while the shells of the Diplomat Motel buildings and the Howard Johnson buildings were assigned useful lives of 40 years. Respondent also asserted longer useful lives than petitioners for the components listed by petitioners on their original returns.A comparison of the exact data urged upon us by the parties appears in the charts set out earlier in our findings. In his notice of deficiency, respondent, as a result of his determination with respect to the useful lives of building shells and components, disallowed depreciation deductions taken by petitioners totaling $ 403,938.22 and $ 353,145.84 in 1973 and 1974 respectively. Demolition Loss
During the taxable year 1973, petitioners, through a partnership (Claytons Realty), had under construction a two-story motel building known as Howard Johnson Number 7. Because of the Arab oil embargo and the proliferation of motel units in the vicinity, a decision was made to convert that property into a one-story office building. At the time construction of the motel ceased, the concrete foundation was *338 laid, the first floor masonry walls were erected, the second floor pre-stressed concrete slabs were laid, much of the rough plumbing had been installed on both floors as well as some of the electrical rough, and the stairs and stairwells had been completed. Holes had been cut into the second floor for the rough plumbing and electrical rough had been installed on the first floor. Building materials for further construction had also been delivered before the orders could be cancelled. The following materials could not be salvaged: (1) The first floor concrete slabs. (2) Wire mesh. (3) All of the partially completed second floor masonry walls. (4) All the rough electrical work on second floor. (5) The stairs leading to the second floor. (6) The second floor pre-cast roof beams and bar joists which were delivered but could not be used. On its 1973 return, Claytons Realty originally reflected an abandonment loss of $ 82,791.87. This calculation was prepared by petitioners' accountant, James Johnson. Edward N. Fielding, petitioners' chief construction contractor, helped to plan and construct all of the Howard Johnson Motel buildings. He authorized payment for all materials and *339 labor expended in the construction of Building Number 7. Subsequent to filing of the original abandonment loss claims, Mr. Fielding examined each expenditure on the cost ledger cards for Building Number 7 and determined that materials costing $ 12,167.63 were used in the construction of other motels but were mistakenly entered on the cost cards of Building Number 7. Thus, the total costs allocable to Building Number 7 were $ 98,224.24 in lieu of $ 110,391.87. It was therefore apparent that the partnership return reflecting a demolition loss of $ 82,791.87 was incorrect. Mr. Fielding then proceeded to estimate the amount of materials and labor which were salvaged and used in the conversion of the motel structure to an office building. He accomplished this by first calculating the salvageable construction costs of the first floor. He used the following method to arrive at first floor salvage: Of the $ 16,310.34 paid for masonry labor on the building, $ 10,010.12 was allocable to the first floor and hence salvageable in the new one-story office building. From these figures a 61 percent figure was derived which was applied to determine the salvaged portion of all costs allocable to *340 both the first and second floors. All costs allocable to only second floor construction were lost and therefore did not enter into the computation. In summary, Mr. Fielding's analysis concluded that of the $ 98,224.24 actually expended on Howard Johnson Building Number 7, $ 36,533.56 was salvaged and reused in the office building, thereby indicating that $ 61,690.68 in costs of material and labor was unsalvageable. Respondent in this notice of deficiency disallowed the entire abandonment loss claimed by petitioners through their partnership. Respondent argues that the building was converted and not abandoned and all costs on the building should be capitalized. Alternatively, respondent alleges that if an abandonment loss was sustained by petitioners during 1973, petitioners have failed to substantiate the amount of the loss with the required specificity. Excess Compensation
On January 11, 1965, petitioners Charles and Malcolm Clayton incorporated a business known as Orlando Executive Park, Inc. (OEP), each owning 50 percent of the stock of said corporation. In the years in issue, OEP operated and managed the Howard Johnson motel complex. Three of the six buildings in the complex *341 are owned by OEP while the others are leased from petitioners' partnership by OEP. During the same period the president of OEP was Ms. Willa Norwood, petitioner W. Malcolm Clayton served as the secretary-treasurer and petitioner Charles W. Clayton, Jr. served as vice-president. Ms. Norwood was also responsible for the management of day-to-day operations of the motel complex. The board of directors of OEP was made up of its president Willa Norwood and both petitioners. At a board meeting in December of 1968 it was decided that the profit picture of the corporation made it advisable to delay paying salaries to the petitioners. In a meeting in September of 1969 the board voted salaries of $ 28,000 to each petitioner in recognition of the fact that the prior years' corporate financial position precluded payment in those years. On December 1, 1970, the board of directors voted to increase the salaries of petitioners to $ 35,000 for 1970. This arrangement was repeated in 1971. On March 2, 1972, petitioners entered into an employee agreement with OEP. Pursuant to paragraph 3 of the agreement the corporation would pay to each petitioner a base salary of $ 35,000 per year. Paragraph *342 7 of the agreement provided that a cash bonus could be paid to petitioners if they had contributed substantially to the success of the corporation. The determination of whether such a bonus should be paid rested within the sole discretion of the board of directors of OEP. A bonus incentive plan attached to the employee agreement provided that in addition to a base salary of $ 35,000 per year, petitioners would be entitled to 35 percent of the taxable income [3] of the corporation between $ 10,000 and $ 200,000 and 37 1/2 percent of income over $ 200,000. Paragraph 9 of the employee agreement reads as follows: 9. Excess Compensation: In the event the compensation paid to the Employee is disallowed as a deduction to the Corporation under Section 162 of the Internal Revenue Code and its Florida counterpart, or any successor sections or under the Economic Control Act of 1971 and such disallowance becomes final, and if the Corporation is required to pay a deficiency on account of such disallowance, Employee shall refund to the Corporation an amount equal *343 to the disallowed portion of said compensation. Such disallowed amount shall be paid to the Corporation within one year after the date on which the Corporation paid the deficiency with respect to such compensation. However, Employee shall be obligated to make such repayments only if the amounts so repaid to the Corporation will be deductible or excludable from the gross income of the Employee under Section 1341 of the Internal Revenue Code of 1954, as amended, or any statute of similar import, and if such repayment is determined not to be deductible or excludable by Employee such repayment shall be refunded by the Corporation to Employee within 90 days from the date of such determination. On September 3, 1972, the board of directors of OEP met to discuss the successful year that the corporation had just enjoyed. The board voted to set salaries for each petitioner at $ 75,000 and to pay each petitioner $ 236,000 "in order to pay back salaries for preceding years." Pursuant to this resolution, on September 5, 1972, OEP paid $ 36,000 to each petitioner and executed notes in the amount of $ 200,000 payable to each petitioner. OEP deducted the cash paid and the face value of the notes *344 given as employee salary on its corporate income tax return for the fiscal year ended September 30, 1972. Each petitioner, however, did not actually receive payment on his $ 200,000 note until September of 1973 and accordingly reported his $ 200,000 bonus on his 1973 Federal income tax return. Petitioners, in addition to general and administrative duties performed for OEP, engaged OEP in construction operations through their experience and skill in the construction industry.Through related entities, petitioners provided the corporation with construction operations which ultimately lead to the erection of buildings at an approximate cost of $ 2,091,000. A normal contractor's fee of approximately 10 percent was never paid for these services. Additionally, petitioners, as licensed real estate brokers, were responsible for the acquisition of leases from tenants who rented offices in the OEP building. Gross rental income from these acquisitions was $ 95,000. No broker's commission was ever paid by OEP due to the services rendered by petitioners in acquiring leases. Petitioners owned and controlled the 10 other corporations, 4 partnerships, 6 office buildings, an insurance brokerage, *345 a construction company, a real estate brokerage, and a utility company. Thus, petitioners devoted at least a portion of their 70 hour work week to business pursuits other than OEP. On its corporate income tax return for the year ended September 30, 1972, OEP deducted $ 485,915 [4] as officers' salaries. OEP reported taxable income of $ 90,951.71 for the year ended September 30, 1972 and had retained earnings of $ 123,336.90 at that date. The corporation has no history of paying dividends to its shareholders. Respondent performed several studies to determine the reasonableness of the salaries deducted by OEP. Based on a 1976 motel industry survey of executive compensation respondent determined that petitioners' compensation exceeded the standard paid to executives in the lodging industry by $ 406,497. Respondent also argues that petitioners' claimed salaries are excessive based on a local industry survey which utilizes the ratio of officers' salaries to sales. Based on the Almanac of Business and Industrial Financial Ratios respondent determined that *346 $ 36,168 was a reasonable salary for each petitioner. Respondent, in an amended answer to the petition, claims that the bonus payments of $ 200,000 to each petitioner are dividends to the petitioners-shareholders. As such, the payments would not be eligible for the maximum tax rate on earned income provided by section 1348. Sale/Gift to Orange County
During the years in issue, petitioners and E.G. Banks were all one-third partners in a partnership known as the Eastside Land Trust. The partnership was engaged in the development of real estate and occasionally sold some of its unimproved lots to other developers. On September 27, 1971, petitioners and E.G. Banks entered into an option agreement with the Hall Estate through the Commercial Bank at Winter Park, as trustee, to purchase a parcel of land located in Orange County, Florida (hereinafter referred to as the Cross Creek property). The option contract indicated that the purchase price would be $ 475,000. A subsequent survey revealed that the tract was composed of 127 acres, 25 of which were to be reserved by the sellers. Subsequently, an additional contract was made whereby petitioners would pay $ 30,000 for the 25 acres *347 originally reserved by the sellers. These 25 acres were contiguous to lands owned by the city of Winter Park. Petitioners, at the time of the option agreement, hired a planning company, headed by Mr. King Helie, to design a plan for the highest and best use of the property. Mr. Helie had the reputation of being the pioneer of the Planned Unit Development (PUD) program for Orange County. He designed a planned unit development to utilize the overall tract of property. According to the plan, only a small segment of the property was to be developed with homes, while large portions of acreage were to be used for hiking and bicycling. With the plan developed, on December 2, 1971 the partnership sought annexation of the property by the City of Winter Park. The partners felt that once Cross Creek was annexed by the City of Winter Park they could obtain the appropriate zoning and proper sewage hookups for the development. However, the City Commissioners did not approve petitioners' plan as local property owners were opposed to the development. Subsequent to the rejection of petitioners' annexation proposal, but before acquisition of the property, petitioners became interested in donating *348 a parcel of land to Orange County for use as a public park. Petitioners learned that once a land tract was obtained by the County for recreational use, Federal funds matching the value of the donated parcel could be obtained by the County from the Department of the Interior to finance the purchase of contiguous land. Thus, an enlarged park facility would result. Therefore, petitioners entertained the thought of gifting a portion of the property to be purchased from the Hall Estate while selling another portion to the County with the purchase price therefor coming from the Federal government. In late summer of 1972 petitioners and their partner E.G. Banks applies for a loan of $ 475,000 from the Great American Mortgage Investors (GAMI) to finance the purchase of the Cross Creek property from the Hall Estate. On September 12, 1972, a loan agreement for the $ 475,000 was executed subject to several conditions. Paragraph 16, subdivision L of the agreement contained the following condition: Of approximately 102 acres, about 40 acres will be condemned and purchased fo r Orange County for a park. 100% of purchase price to apply to GAMI principal reduction. Also, about 20 acres must *349 remain zoned for single family residential per County requirement. 100% of sales price or value (if Borrowers build) to apply to GAMI principal reduction. * * * On October 17, 1972, petitioners through their partnership, the Eastside Land Trust, purchased approximately 127 acres of land for $ 505,000 from the Hall Estate which encompassed some 53.3 acres to be acquired by Orange County through donation and purchase. Approximately 45 of the 53.3 acres were covered with muck deposits varying in depth. The existence of the heavy muck deposits did not allow for the profitable development of the 45 acres. Additionally, as indicated in a U.S. geological survey formulated in 1970, the natural contour of the property caused a flow of water to run southerly across the property to Howell Branch Creek. This creek governs the water level of the property in this area. Thus, the water level on the acquired land created vast uncertainty in the feasibility of construction on the property. By letter dated October 31, 1972, the Commercial Bank at Winter Park advised the Orange County Board of Commissioners that petitioners wished to donate a 25.7 acre parcel of property to the county. On the same *350 date, a memorandum from E.G. Banks, petitioners' partner, to County Commissioner Ralph Poe noted in pertinent part: We have determined that there could be some problem with reference to tying the gift of the twenty-five acres to the county to a collateral agreement whereby the county will agree to buy additional adjoining acreage. In certain cases the Internal Revenue has ruled that on a contractual basis, the gift is disqualified for tax purposes. By letter dated November 6, 1972, Mr. Don E. Dudan, of the Bureau of Planning of Grants, State of Florida, advised Mr. James L. Harris, County Administrator, to submit a copy of the County's generalized development plan and complete appraisals of the property to be purchased and donated prior to completing an application for Federal moneys. Contrary to normal county procedures, in January 1973 petitioners and not the county, requested a Mr. William Pardue, Jr. to make the appraisals for Orange County. On January 18, 1973, Mr. Pardue completed his appraisals for the county citing the development of condominiums and townhouses as the highest and best use of the property and stating that the fair market value of the property of the parcel *351 to be purchased (27.6 acres) was $ 225,000 while the parcel to be given (25.7 acres) had a value of $ 200,000. Pardue arrived at his valuation through an examination of sales of other properties with similar highest and best uses. The Commercial Bank of Winter Park acting as trustee paid for these appraisals. Another appraisal was performed for the Commercial Bank of Winter Park on almost the entire tract to be sold to Orange County. This appraisal indicated that the estimated value of the track was only $ 103,000. On February 7, 1973, petitioners, through their corporate trustee, informed the Bureau of Planning and Grants that they were agreeable to a consolidation of Mr. Pardue's appraisals of January 18, recognizing a total value of $ 425,000 for the entire tract. Thus, the petitioners would contribute land allegedly worth $ 212,500 and would sell a parcel for $ 212,500 to the County. After formal application for a Federal grant had been completed and approved both properties were deeded to Orange County on September 12, 1973 and $ 212,500, which was the stated sales price, was transferred to petitioners' partnership the Eastside Land Trust. The transaction was subsequently *352 subject to scrutiny by both the State and Federal governments. Audits performed by both governments questioned the accuracy of Pardue's appraisal. The Federal audit recommended that a $ 425,000 cost adjustment be made on the basis that an inadequate appraisal was submitted. The report provides in pertinent part: Our audit of property acquisitions at FOR's Southeastern Regional Office (SERO) disclosed that the local participant accepted an appraisal that we believe was inadequate because: 1. It was based on an invalid assumption that the water level on the acquired land would be lowered in excess of 5 feet (from over 63 feet to approximately 58 feet). 2.The comparable land sales cited in the report as a basis for establishing value were selected from areas dissimilar in nature to the land being acquired. In their Federal income tax returns for 1973 each petitioner deducted his share ($ 66,667.00) [5] of the partnership property donated to Orange County as well as a proportionate share of the $ 105,865 of long-term capital gain returned by the partnership. In the notice of deficiency respondent disallowed this charitable contribution on the grounds that each petitioner received an *353 economic benefit from the donation and has failed to evince donative intent in the transfer. Respondent cites a drainage basin or a nature park as the highest and best use of the property and asserts that based on comparable sales the fair market value of the property is $ 1,150.00 per acre. Thus respondent urges a value of $ 61,000 for the entire 53-acre parcel, none of which qualifies as a charitable contribution under section 170. Additionally respondent determined that the gain on the sale to Orange County was ordinary income arguing that the property was held for sale in the ordinary course of business. Sale/Gift to Winter Park Church
On February 6, 1974, petitioner Charles W. Clayton received a formal proposal from the Winter Park Church of Religious Science, Inc. to purchase approximately two acres of land located in Maitland, Florida. The proposal contained the following provision concerning a simultaneous gift to the church: It is agreed that at the time *354 of giving title to above described two acres, Seller agrees to give Buyer without cost a parcel of land located on the South side of above described property having a dimension of 574 feet as shown on the attached map. Obviously, the proposal was the product of prior contact between petitioners and the church. Petitioners' attorneys expressed concern to petitioners regarding the sale and gift to the church. They suggested that great care be exercised in drafting the transactional documents in order to avoid an Internal Revenue Service contention that the gift to the church was contingent upon the sale, thus nullifying the deduction for a charitable contribution. The contract of sale dated April 22, 1974, indicated that the church agreed to pay $ 63,000 for a tract of land and contained the following provision: Buyer may at its option rescind this agreement if at or before the closing date it has not receive[d] a gift from the ComBank/Winter Park, acting as Trustee for its principals, consisting of a full warranty deed, free and clear of encumbrances, of the approximate one (1) acre parcel * * *. On June 18, 1974, the Commercial Bank of Winter Park as fiduciary of petitioners' Eastside *355 Land Trust conveyed two contiguous parcels of land by warranty deed to the Winter Park Church of Religious Science, Inc. citing $ 63,000 as the purchase price. One parcel contained 1.87 acres while the alleged gifted parcel measured.91 acres. The parcels were located in an area predominantly zoned for single family residential use. Petitioners became aware that should the Internal Revenue treat the entire gift/sale transaction as merely one integrated transaction, the burden would fall on petitioners to prove that the purchase price of $ 63,000 exceeded the value of both the gifted and purchased parcels. Thus, after the transaction was consummated the petitioners engaged William Pardue to perform an appraisal of the properties. Using the comparable sales method, the Pardue appraisals valued the sale portion of the property at $ 66,000 and the alleged gifted property at $ 31,000. Pardue concluded that the highest and best use of the property could be realized by the erection of a church. Respondent, after performing an appraisal of the properties, concluded that the highest and best use of the property was as single family residential use which conformed to the prevailing zoning *356 regulations and that the value of both tracts was only $ 51,550. Respondent noted that allegedly comparable sales cited by Pardue could not serve as a useful means of comparison for various reasons including differences in geographical location, dissimilar zoning regulations, and the differing condition of development. The Eastside Land Trust deducted $ 35,000 [6] *357 as a charitable contribution representing the fair market value of the property allegedly gifted to the Winter Park Church of Religious Science. The trust further reported $ 44,550 [7] as a long-term capital gain representing the gain on the parcel of land sold to the Winter Park Church. Petitioners, each with a one-third interest in the venture, reported their respective shares of these items on their 1974 returns. In an amended answer to the petition respondent asserted that the transaction with the church did not result in a charitable contribution. Respondent argues that the sale and gift transaction should be viewed as one transaction wherein petitioner sold two parcels of land for $ 66,000. Additionally, respondent asserts that the gain reported by petitioners on the sale to the Winter Park Church should be ordinary income. In an amended answer to the petition, respondent alleged that the property transferred by petitioners was not held for investment and thus capital gain treatment should not ensue. Liquidation of Howell Hills, Inc. In the mid-1960's petitioners W. Malcolm Clayton and Charles W. Clayton, together with a third party, Mr. James Hargis, formed a corporation known as Howell Hills, Inc. The corporation was established for the purpose of developing land. The parties have stipulasted that each petitioner had a basis of $ 200 in the Howell *358 Hills stock. [8]
The corporation was involved in the sale of homes it constructed. As a result of many purchasers' inability to make the entire downpayment on a house, Howell Hills took second mortgages with a duration of up to 30 years on the homes it constructed. Frequently, the mortgagors were delinquent in making mortgage payments.In addition, the corporation possessed *359 similar second mortgage notes received by other corporations whollyowned by petitioners, which notes were subsequently assigned to Howell Hills. These notes generally bore interest at the rate of 6 percent. Foreclosure proceedings on many of the mortgages which were in default would not have been a profitable endeavor due, in large measure, to the fact that many mortgage notes were executed in an amount less than $ 4,000. On September 24, 1974, at a meeting of the Board of Directors and stockholders of Howell Hills, it was resolved that the corporation would bve liquidated. Pursuant to this resolution, on October 11, 1974, petitioner W. Malcolm Clayton, as president of the corporation, informed the Internal Revenue Service that Howell Hills was to be liquidated under section 333. At that time petitioners, who were the only remaining shareholders of Howell Hills, filed their timely consents to the liquidation pursuant to section 333, thus making a valid election under that section. Upon liquidation of Howell Hills each petitioner received assets with a book value of $ 32,303.75 consisting of $ 15,493.41 in cash and $ 16,810.34 in notes and related company receivables. Howell *360 Hills had a surplus of $ 64,207.51 on the date of its liquidation. Petitioners reported their gain on the liquidation of Howell Hills as long-term capital gain. [9] Respondent in his notice of defociency, disallowed capital gainsd treatment and asserted that under section 333(e) each petitioner's gain of $ 32,103.75 [10] be treated as a dividend. Land Planning Costs[11] *361 As noted earlier, in 1972 petitioners and their associate E.G. Banks, as owners of the Eastside Land Trust, purchased approximately 127 acres of land known as the Cross Creek property. Subsequently, petitioners retained the services of numerous professional people including engineers, attorneys, and land planners to achieve a Planned Unit Development (PUD) zoning classification for the property. These professionals were then required to make detailed presentations to the zoning board. During 1972 the PUD concept was not accepted by the City Commissioners of Winter Park who therefore rejected petitioners' application for annexation of the Cross Creek property into Winter Park. In April of 1973 petitioners applied for annexation of the Cross Creek property into *362 the city of Maitland, Florida. On July 30, 1973, the property was annexed into the city of Maitland. At this point Maitland had no Planned Unit Development ordinance. It appears that by June 1974 the city of Maitland already had a Planned Unit Development ordinance and that petitioners verbalized their intent to develop the property to the zoning administrator. However, for reasons not apparent from the record, on June 26, 1974 petitioners directed that costs incurred in the development of the Cross Creek property in 1972 and 1973 be written off as expenses. At a meeting of the Eastside Land Trust on July 2, 1975 it was resolved that on July 17, 1975 King Helie, petitioners' planning consultant, would present a new PUD program to the Orange County Planning and Zoning Board. The new PUD program related only to petitioners' Expressway property with respect to which pewtitioners have conceded that any deduction for abandoned land planning costs in 1973 and 1974 would be improper. Petitioners' partnership deducted $ 25,747 in abandoned land planning costs on its 1973 return and took a similar deduction in 1974 in the amount of $ 5,751. In an amended answer to the petition respondent *363 alleged that development costs on the Cross Creek property should have been capitalized rather than expensed.Respondent asserts that an abandonment of plans to develop the Cross Creek property did not occur during the years in issue. Sections 6651 and 6653 Penalties
Petitioners filed untimely 1973 income tax returns even after obtaining two extensions of time to file their returns. [12] *364 Their returns were prepared by an accountant, Mr. James Johnson, who admittedly was not "a great tax accountant." Petitioners' late filing was due to the fact that the accountant who was responsible for the Diplomat Motel operations left the employ of petitioners. [13] Subsequently this accountant agreed to return but at a time too late for the timely filing of petitioners' returns. Petitioners also contend that complexities of tax adjustments in prior years to petitioners' partnership returns was an additional cause of their tardiness. In his notice of deficiency respondent alleged that petitioners' failure to file timely returns was not due to reasonable cause and therefore added 5 percent of the tax due to petitioners' tax pursuant to section 6651(a)(1). In his notice of deficiency, pursuant to section 6653(a) respondent added 5 percent of the underpayment for 1973 and 1974 to petitioners' taxes. Petitioners' 1973 and 1974 returns, which were prepared by their accountant, Mr. James Johnson, originally reflected several deductions which petitioners conceded prior to trial. Among these were the following: (1) Petitioners claimed additional first year depreciation in excess of the dollar limitation imposed by section 179. (2) Petitioners computed depreciation on several motel buildings using the double declining balance method. Use of this method of depreciation was clearly erroneous in view of section 1.167(j) of the Income Tax Regulations. (3) Petitioners as equal owners of a real estate management operation each deducted $ 17,287.57 for rental losses incurred in the management of office buildings during 1974 when the actual aggregate loss on the operation of the buildings was $ 17,287.57. (4) Petitioners claimed a $ 25,000 *365 interest expense deduction on 1973 for payment of a service fee to a mortgage company in order to obtain a loan. OPINION DEPRECIATION Section 167 provides that there shall be allowed as a depreciation deduction a reasonable alloweance for the exhaustion, wear and tear including a reasonable allowance for obsolescence) of property used in a trade or business. Section 1.167(a)-1(a) of the Income Tax Regulations indicates that the annual allowances which should be set aside should be determined pursuant to a reasonably consistent plan, so that the aggregate of these amounts, plus the salvage value of the asset, will at the end of the estimated useful life of the depreciable property, equal the cost or other basis of the property. Section 1.167(a)-7(a) of the Income Tax Regulations provides: Depreciable property may be accounted for by treating each individual item as an account, or by combining two or more assets in a single account.Assets may be grouped in an account in a variety of ways. For example, assets similar in kind with approximately the same useful lives may be grouped together. Such an account is commonly known as a group account. Another appropriate grouping might *366 consist of assets segregated according to use without regard to useful life, for example, machinery and equipment, furniture and fixtures, or transportation equipment.Such an account is commonly known as a classified account.A broader grouping, where assets are included in the same account regardless of their character or useful lives, is commonly referred to as a composite account. For example, all the assets used in a business may be included in a single account. Group, classified, or composite accounts may be further broken down on the basis of location, dates of acquisition, cost, character, use. etc. Petitioners in their tax returns for 1973 and 1974 allocated most of the costs of their buildings to the shells of the structures. Respondent, in an initial determination, cited much longer useful lives for these shells than claimed by petitioners. Subsequent to the filing of their returns and during respondent's examination, petitioners revised their depreciation schedules by reallocating costs initially attributed to the shell to other components, some of which were not originally listed. This revision was accomplished principally through the efforts of Mr. Edward N. Fielding, *367 the petitioners' building contractor. Respondent argues that pewtitioners' revision was a scheme to circumvent the effects of a longer useful life for building shells as initially determined by respondent. [14]
Costs of components of buildings constructed for the taxpayer, such as building shells, roofs, floors, wiring, plumbing, ceiling, air conditioning, and other items may be placed in separate accounts and depreciated separately. The buildings do not have to be depreciated by determining a composite life for a building as a whole. Shainberg v. Commissioner, 33 T.C. 241 (1959). Respondent does not dispute that petitioners were originally entitled to use the component *368 method of depreciation. However, respondent argues that petitioners are now precluded from its use on the ground that they have not explained how prior years' depreciation was considered in arriving at their revised depreciatioj schedules. [15] Thus respondent asserts that the failure to so reconcile current depreciation with prior deductions necessitates the use of the composite method of depreciation. We initially note that all of petitioners' buildings except the Diplomat Motel Building #3 and Burroughs, Clayton and Lee Parkway Buildings were constructed prior to 1973. Accordingly, respondent's argument focusing on the effect of prior depreciation deductions can relate only to those buildings erected prior to 1973, the first year in issue herein. Section 1.167(a)-7(c) of the Income Tax Regulations provides in pertinent part: Where depreciation reserves are maintained, a separate reserve account shall be maintained for each *369 asset account. The regular books of account or permanent auxiliary records shall show for each account the basis of the property, including adjustments necessary to conform to the requirements of section 1016 and other provisions of law relating to adjustments to basis, and the depreciation allowances for tax purposes. * * * Respondent's determination is presumptively correct and the burden rests with petitioners to show that respondent's determination is incorrect and that the depreciation claimed is reasonable. Pohlen v. Commissioner, 165 F.2d 258 (5th Cir. 1948); Casey v. Commissioner, 38 T.C. 357 (1962). The regulations provide that a taxpayer must furnish the respondent full information as to the cost of the property, as to the time of its acquisition and as to the period of its useful life. Petitioners, in their revised depreciation schedules, do not reveal how prior years' depreciation was considered in arriving at their revised figures for their buildings which were erected prior to the years in issue. It is evident that some of the prior deductions related to components previously included in building shells. Petitioners are now attempting to segregate many of the components *370 from the shells. The law clearly mandates that petitioners prove what the depreciable bases are for the various components. Nowhere do petitioners establish the proper depreciable bases of components. Rather, their revised schedules merely reflect the claimed costs of these components without detailing adjustment to basis as provided by section 1016(a)(3). Thus we asgree with respondent that petitioners cannot revise their original depreciation schedules where no accounting exists relating to the effect of prior years' depreciation deductions on the bases of components whichu petitioners now seek to break out from their building shells. As to all of petitioners' buildings including those constructed after 1972, the record discloses that in devising their revision, petitioners' building contractor, Edward N. Fielding, examined all cost ledger cards in order to allocate costs to the proper components. Rarely, however, was reference made to actual invoices detailing the exact nature of the expenditure. Although we are impressed with Mr. Fielding's credentials and experience, we do not believe that section 1.167(a)-7, Income Tax Regs. envisions an accounting system wherein years *371 after the completion of buildings a construction supervisor eamines literally thousands of entries on cost ledger cards and predominantly from memory assigns expenditures to what he believes was the proper account.Furthermore, plumbing and electrical expenses were allocated to accounts entitled "plumbing rough," "plumbing fixtures," "electrical rough," and "electrical fixtures." The allocation for plumbing was made on the assumption that rough and fixtures each accounted for 50 percent of the total plumbing expense. Similarly, it was assumed that 60 percent of the total electrical expense could be allocated to electrical rough. Thus, for purposes of section 167, where the burden is on petitioners to show that their determination is reasonable, Pohlen v. Commissioner, supra, petitioners cannot sustain that burden where the bases of assets are sought to be proved via methods which are imprecise and prone to error. Therefore, we must address the issue of the useful lives of petitioners' buildings and improvements without regard to petitioners' attempt to segregate components from shells pursuant to their revision. The estimated useful life of an asset is determined within the guidelines *372 provided by section 1.167(a)-1(b), Income Tax Regs: For the purpose of section 167 the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income. This period shall be determined by reference to his experience with similar property taking into account present conditions and probable future developments. Some of the factors to be considered in determining this period are (1) wear and tear and decay or decline from natural causes, (2) the normal progress of the art, economic changes, inventions, and current developments within the industry and the taxpayer's trade or business, (3) the climatic and other local conditions peculiar to the taxpayer's trade or business, and (4) the taxpayer's policy as to repairs, renewals, and replacements. * * * If the taxpayer's experience is inadequate, the general experience in the industry may be used until such time as the taxpayer's own experience forms an adequate basis for making the determination. * * * Petitioners' original tax returns for 1973 and 1974 reflect *373 useful lives of 20 years for the shells of their office and motel buildings. [16] *374 What seems curious to us as well as to respondent is that pursuant to petitioners' revised schedules to which our attention has already been addressed, petitioners assign useful lives of 22 years to office buildings and useful lives of 25, 30 and 33 years to various motel buildings. There was, of course, a simultaneous shift of a great portion of shell costs to components and leasehold improvements which reflected much shorter useful lives u-nder the revised schedules. Respondent asserts a useful life of 45 years for all of the shells except Howard Johnson Buildings #4, #5, and #6 and the Diplomat Motel Buildings #1, #2, and #3 which are assigned useful lives of 40 years. USEFUL LIVES OF BUILDING SHELLS The issue of an asset's useful life is inherently one of fact, and, as noted above, it is petitioners' burden to demonstrate that the useful lives determined by respondent are erroneous. Dielectric Materials Co. v. Commissioner, 57 T.C. 587, 592 (1972); Rule 142(a), Tax Court Rules of Practice and Procedure. The useful life of an asset is the number of years th asset is expected to function profitably in use. Massey Motors v. United States, 364 U.S. 92, 96 (1960). Petitioners' building contractor and architect testified that petitioners' office and motel buildings were constructed with a short-life cycle in mind. It is argued that cheap construction materials were used to this end. Thus, it would seem that petitioners could not envision the profitable use of these buildings for a period in excess of 20 years. Yet we note that petitioners have transferred some of their buildings to a trust to benefit their children and simultaneously entered into a lease arrangement with the trustee whereby petitioners would have use of the buildings for periods of 44 to 50 years. Furthermore, petitioners in 1974 engaged Mr. William C. Smith to perform an appraisal *375 of petitioners' Corporate Square building. Mr. Smith, a member of the American Institute of Real Estate Appraisers, stated that the useful life of the building was 40 years. For these reasons and in light of the fact that the main thrust of petitioners' argument was presented by their own building contractor and architect, we are generally unikpressed by the "short life cycle" argument advanced by petitioners. Petitioners further allege that conditions in the Orlando area in 1973 and 1974 justify a reasonable allowance for obsolescence on petitioners' buildings.
Section 1.167(a)-9, Income Tax Regs., provides with respect to obsolescence: The depreciation allowance includes an allowane for normal obsolescence which should be taken into account to the extent that the expected useful life of property will be shortened by reason thereof. Obsolescence may render an asset economically useless to the taxpayer regardless of its physical condition. Obsolescence is attributable to many causes, including technological improvements and reasonably foreseeable economic changes. Among these causes are normal progress of the arts and sciences, supersession or inadequacy brought about by developments *376 in the industry, products, methods, markets, sources of supply, and other like changes, and legislative or regulatory action. In any case in which the taxpayer shows that the estimated useful life previously used should be shortened by reason of obsolescence greater than had been assumed in computing such estimated useful life, a change to a new and shorter estimated useful life computed in accordance with such showing will be permitted. No such change will be permitted merely because in the unsupported opinion of th taxpayer the property may become obsolete * * * Deductions for obsolescence afford the taxpayer the opportunity to recover the cost of an asset where deductions for wear and tear will be insufficient to restore to him the basis of an asset because the life thereof has been shortened by reason of its having been rendered inutile for the function it once performed. Zimmerman v. Commissioner, 67 T.C. 94 (1976); Southeastern Building Corp. v. Commissioner, 3 T.C. 381 (1944), affd. 148 F.2d 879 (5th Cir. 1945), cert. denied 326 U.S. 740 (1945). Thus, an allowance for obsolescence is contingent upon a showing by the taxpayer that conditions in the relevant industry have *377 rendered his assets inutile. Real Estate-Land Title & Trust Co. v. Commissioner, 309 U.S. 13 (1940); Zimmerman v. Commissioner, supra.
Petitioners' proof of obsolescence consists mainly of three elements: (1) detailed data concerning reduced occupancy in their motels and office buildings, (2) citation to the Arab oil embargo of 1973 which caused a skyrocketing of operational costs and (3) with respect to petitioners' motels, the geographical disadvantage of the motels caused by the abundance of motels constructed by others to the south and west of Orlando which were nearer to Disney World. With respect to the first element, petitioners intimate that the 1973-1974 economic "bust" in the Orlando area resulted in vastly reduced occupancy rates for their motels and office buildings. We can readily understand the state of declining profits which followed the overbuilding of motels and offices. Yet we believe petitioners fail to distinguish between obsolescence and competition. A reduction in profits or declining values due to competition is not sufficient to sustain a deduction for obsolescence. Detroit & Windsor Ferry Co. v. Woodworth, 115 F.2d 795 (6th Cir. 1940). Petitioners must *378 show either a dramatic shift in the state of the industry which has rendered their assets inutile or a reasonably prospective intended abandonment resulting from external forces to sustain a deduction for obsolescence. Zimmerman v. Commissioner, supra; Real Estate Land Title & Trust Co. v. Commissioner, supra.Petitioners through detailed exhibits and expert testimony have certainly convinced us that external forces have resulted in plummeting occupancy rates in their buildings for the years in issue, especially when compared to the national averages for these rates. However, petitioners have shown neither a reasonably prospective intended abandonment of their assets nor that their assets are inutile in their business. Obsolescence requires that the operative cause of the present or growing uselessness arise from external forces which make it desirable or imperative that the property be replaced. S.S. White Dental Mfg. Co. v. United States, 93 Ct. Cl. 469, 38 F.Supp. 301 (1941). Petitioners have not presented us with any evidence which indicates that replacement or abandonment of the buildings is contemplated. Furthermore, Dr. Frederich A. Raffa, chairman of the Department of Economics *379 and Finance at Florida Technological University testified that although occupancy levels in office buildings declined sharply between 1972 and 1976, there has been a slight recovery in occupancy since that period. Thus, although economic conditions were unique in the years in issue, it remains evident that the possibility of economic recovery exists. We have held that indefinite expectations and suppositions are not enough to support a claim for obsolescence. Stevens Pass, Inc. v. Commissioner, 48 T.C. 532 (1967); Dunn v. Commissioner, 42 T.C. 490 (1964). Since petitioners have not evinced an intent to abandon or replace their buildings and the possibility of economic recovery is extant we are not convinced that the number of years that petitioners' assets are expected to function profitably in use has been shortened by the unique economic conditions in Orlando. See Massey Motors v. United States, supra.
We are likewise unimpressed with petitioners' assertion concerning the Arab oil embargo of 1973. The spiraling costs of oil to businessmen nationwide is indeed a grave problem in our economy. Yet in order for obsolescence to be a factor in determining useful lives, petitioners *380 must establish with reasonable certainty that their assets will be obsolete before the end of their normal lives. Dunn v. Commissioner, supra, at 494. Petitioners have offered no evidence concerning their attempt to abandon buildings nor have they shown that economic conditions have shortened the lives of their assets. Indeed, the high cost of oil has increased petitioners' operational costs. However, conditions could very well change so that the Orlando economy would recover and indeed Dr. Raffa so intimated. Thus, it is entirely possible that petitioners' buildings could be operated at a profit in the future. The third element of petitioners' obsolescence argument pertains to petitioners' motels. The issue centers on petitioners' contention that the establishment of Disney World shifted the motel business center from north of Orlando to southwest of the city, thus contributing to the great reduction in occupancy rates in petitioners' motels. Although the reasonableness of useful lives is determined on the basis of conditions known at the end of each taxable year, section 1.167(b)-1(a), Income Tax Regs. it is permissible to point to subsequent developments to show the importance *381 of a particular factor in determining the useful life of an asset. Bradford, Inc. v. United States, an unreported case (D.C.Del. 1972) 30 AFTR2d 72-5504, 72-2 USTC par. 9671), affd. per order (3rd Cir. October 30, 1973). Indeed, Dr. Raffa, a professor of economics, emphasized for the years in issue the sharp decline in petitioners' motel occupancy rates, using the Diplomat Motel and Howard Johnson motels as examples. However, Dr. Raffa's presentation also marks the slight recovery experienced by petitioners' motels in 1975. Although occupancy rates in these motels were still below the national average rate we believe that an increase, however slight, in the occupancy rates clearly indicates that petitioners' motels were not inutile for the function they performed. See Coors Porcelain Co. v. Commissioner, 52 T.C. 682 (1969), affd. 429 F.2d 1 (10th Cir. 1970), and Zimmerman v. Commissioner, supra.In Zimmerman an obsolescence deduction was allowed on a motel where changes in traffic patterns rendered the building virtually useless as a motel. Although in that case the motel was continued in operation, this was done only to prevent vandalism and to offset carrying charges until *382 disposal of the motel was possible. On our facts, we are more inclined to think that petitioners intended no prospective abandoment of their motels. Petitioner W. Malcolm Clayton when addressing another issue in this case, testified that the motels were to be used "to take care of anything that was going to happen in the tourist market for a few years to come." Thus, without evidence of the uselessness of the buildings as motels or a reasonably prospective abandonment of their use, we are not prepared to say that petitioners' motels had become obsolete. We have carefully weighed the evidence and are impressed with the credentials of experts testifying on behalf of the parties. We are equally mindful of the fact that the useful life issue is not susceptible to the exactitude which both sides, at times, profess. It is assuredly the imprecise nature of the beast which leads eminently qualified individuals to estimates which are at opposite extremes of the spectrum. We are, however, convinced that the truth does not lie wholly on either side. Although we have rejected the major thrust of petitioners' obsolescence argument, they have introduced evidence tending to support shorter *383 useful lives than those asserted by respondent. Most of the buildings were erected prior to the time when energy conservation was of paramount importance in construction. Several storefronts made of wood and aluminum were subject to accelerated deterioration. We must also consider our earlier holding that petitioners cannot now break out from building shells components which were not cited in their original returns. We therefore hold that the useful lives of the shells of petitioners' office buildings and motels are 35 years from the dates of their construction. USEFUL LIVES OF COMPONENTS AND IMPROVEMENTS IN OFFICE BUILDINGS We now turn our attention to useful lives of leasehold improvements and components in petitioners' offices which were listed on their original returns for the years in issue. Petitioners have convinced us that new tenants and tenants who renew leases in their office buildings require extensive remodeling of the offices before the new tenancy begins. Thus, some of the improvements had to be scrapped at the end of the lease period.Accounting for the fact that approximately 30 percent of the improvements and components were salvageable at the end of a tenancy *384 and that the overwhelming majority of leases spanned no more than a 5-year period, we have concluded the following with respect to the useful lives of components and improvements: Component
Useful Life (years)
Paving & Landscape
10
Roofind
10
Air Conditioning
15
Elevator
15
Plumbing Fixtures
10
Window, Glass & Door
10
Electrical Fixtures
5
Railing & Accessories
5
Partitions, Partition Blinds
& Compartments
5
Carpets & Floors
5
Drapes & Wallpaper
5
Furnishings
5
Telephone System
5
Sound System
5
Other leasehold improvements
5 We reiterate that this holding relates only to components and improvements in office buildings which were posted on petitioners' original returns for the years in issue. Similar components to the ones mentioned above which were separated from building shells pursuant to petitioners' revised depreciation schedules are subject to the useful lives assigned to the sheels for reasons detailed earlier in this opinion. USEFUL LIVES OF COMPONENTS AND LEASEHOLD IMPROVEMENTS OF PETITIONERS' MOTELS
We are faced with a paucity of evidence in the record relating to components and leasehold improvements in petitioners' motels. In fact, the only evidence concerning improvements is that motel carpeting became *385 worn after 5 years. Accordingly, we hold that the useful life of petitioners' motel carpeting is 5 years and we must sustain the respondent's determination that the rest of the components and leasehold improvements on petitioners' returns for the years in issue have a useful life of 15 years. DEMOLITION LOSS Section 165(a) allows taxpayers a deduction for any loss sustained during the taxable year and not compensated for by insurance or otherwise. In 1973 petitioners, through their partnership, had under construction the Howard Johnson Number 7 motel building. The proliferation of motels in the vicinity and the Arab oil embargo caused petitioners to change their plans and they decided to convert the ongoing construction into a one-story office building. As a result, petitioners chief construction contractor indicated that $ 61,690.86 in construction costs had to be scrapped. Petitioners now claim that they are entitled to a demolition [17] *386 loss for the unsalvageable costs. Respondent argues that no demolition loss is allowable in the case of the conversion from motel to office building and thus all costs incurred in the construction of the office building must be capitalized. Section 1.165-3(b)(1), Income Tax Regs., provides in pertinent part: * * * the loss incurred in a trade or business or in a transaction entered into for profit and arising from a demolition of old buildings shall be allowed as a deduction under section 165(a) if the demolition occurs as a result of a plan formed subsequent to the acquisition of the buildings demolished. The amount of the loss shall be the adjusted basis of the buildings demolished increased by the net cost of demolition or decreased by the net proceeds from demolition. * * * The basis of any building acquired in replacement of the old buildings shall not include any part of the basis of the property demolished. Prior to the adoption of the above quoted regulation (January 15, 1960), case law dictated, although with exception, that a taxpayer who demolished an old building in order to replace it with *387 a new one was required to add the adjusted basis of the old building to the basis of the new building rather than deduct it as a loss, even when the intent to demolish was formed subsequent to the acquisition of the demolished buildings. Jones v. Commissioner, 25 T.C. 1100 (1956), reversed on another issue 259 F.2d 300 (5th Cir. 1958); Estate of Edgar S. Appleby v. Commissioner, 41 B.T.A. 18 (1940), affd. 123 F.2d 700 (2nd Cir. 1941); Henry Phipps Estates v. Commissioner, 5 T.C. 964 (1945). However since the adoption of the regulation, a demolition loss has been held to be deductible where the intent to demolish the building was formed after its acquisition even where the purpose of the demolition was to permit the erection of a new building on the land. Gillman v. Commissioner, 72 T.C. 730 (1979); Canelo v. Commissioner, 53 T.C. 217 (1969), affd. 477 F.2d 484 (9th Cir. 1971); McBridge, Jr. v. Commissioner, 50 T.C. 1 (1968). See also Levinson v. Commissioner, 59 T.C. 676 (1973); Randolph Building Corp. v. Commissioner, 67 T.C. 804 (1977). Furthermore in Gillman this Court held that a taxpayer was entitled to a demolition loss under section 1.165-3(b)(1), Income Tax Regs., for *388 the partial demolition of a building. We believe that petitioners are not entitled to deduct the unsalvageable costs attending their conversion of a two-story motel into a one-story office building. The cases noted above which allowed demolition losses when the intent to demolish was formed subsequent to acquisition do not address the circumstance of the taxpayer's demolition of a structure which he is constructing. The major obstacle to petitioners' entitlement to a deduction for a demolition loss rests squarely within section 1.165-3(b)(1), Income Tax Regs., which, in pertinent part, bears repetition: * * * the loss incurred in a trade or business or in a transaction entered into for profit and arising from a demolition of old buildings shall be allowed as a deduction under section 165(a) if the demolition occurs as a result of a plan formed subsequent to the acquisition of the buildings demolished. * * * [Emphasis added.] A proper interpretation of the term "acquisition of the buildings demolished" is not broad enough to be inclusive of a partially completed structure erected by the taxpayer. This conclusion is buttressed by the analysis to follow. The most common application *389 of section 1.165-3(b)(1), Income Tax Regs. , arises where a demolition is antedated by the taxpayer's purchase of a completed building which was used in the trade or business of the taxpayer or was used for the production of income. See e.g. Storz v. Commissioner, 68 T.C. 84 (1977); revd. on another issue 583 F.2d 972 (8th Cir. 1978) (purchase of two buildings, one of which was subsequently rented by the taxpayer for use as a mortuary while the other was rented as an apartment building); Canelo v. Commissioner, supra (taxpayer's purchase followed by rental of the property). The regulation and more specifically the term "acquisition" as used in the regulation were also held to encompass a situation where the taxpayer inherited property, and used a significant portion of it as a residence for himself and his family before converting it to business or income producing use. McBride, Jr. v. Commissioner, supra.In McBride, although we left no doubt that the inheritance of property does not fall within the meaning of the term "acquisition" where the taxpayer seeks a demolition loss, we determined that the conversion of property to business or income-producing use is an event which may *390 be properly described as an "acquisition" as that term is used in section 1.165-3(b)(1), Income Tax Regs. Thus, although it is apparent that the taxpayer need not secure the subsequently demolished building by purchase for purposes of qualifying for a demolition loss, it is evident that the business or income producing use of the property by the taxpayer is a prerequisite for finding an "acquisition" by the taxpayer. Once an "acquisition" is found, the taxpayer would then be entitled to a demolition loss, assuming that the intent to demolish was formed subsequent to the acquisition of the property. In its partially completed state petitioners' structure was obviously not used in their business. We are therefore compelled to hold that petitioners have not acquired the partially completed building within the meaning of section 1.165-3(b)(1), Income Tax Regs.
While we believe that the above analysis is dispositive of the issue before us, we note that our conclusion is consonant with section 1.167(a)-8(a), [18] *392 *393 *394 Income Tax Regs., which petitioners cite as an alternative source for their claim of a deductible loss. That section relates to the treatment of gains and losses resulting from *391 the retirement of an asset from use in a business or income-producing activity. While the retirement of an asset may take several forms including an abandonment of the property or its transfer to a scrap account, the regulation specifically defines a retirement as the permanent withdrawal of depreciable property from use in the trade or business or in the production of income. Since petitioners' partially completed structure was never used in their business, denomination of petitioners' loss as an abandonment or other retirement in lieu of a demolition loss results in the erection of the identical obstacle which prevents the allowance of petitioners' claimed demolition loss. Additionally, our holding is in accord with a line of cases dealing with losses encountered by taxpayers during construction of buildings. In Driscoll v. Commissioner, 147 F.2d 493 (5th Cir. 1945), affg. a Memorandum Opinion of this Court, the taxpayer, during construction, concluded that a change in the size of a hotel building was necessary and that the air conditioning system was inadequate. Thus, much of the materials used in the construction had to be scrapped. In denying a deductible loss for the scrapped items and determining a capitalization of all the taxpayer's construction costs we relied on the following rationale which was quoted by the Fifth Circuit in its affirmance: The acceptance *395 of petitioner's theory would result in a deductible loss in practically every construction project. Common experience tells us that no construction job is carried out with such perfection that some material, because of error, mistake, or even slight change in design, is not removed and therefore does not remain a part of the completed structure. Such expenditures are, we think, clearly a cost of construction. [ Driscoll, supra, at 494.] Wah Chang Smelting and Refining Co. v. Commissioner, 30 T.C. 838 (1958)involved the construction of a hydrogen producing facility. After construction was completed in accordance with the original design, it became apparent that the facility did not function with the anticipated efficiency. Therefore, pursuant to a significantly revised plan of design, construction materials had to be torn out of the facility and discarded. In disallowing an abandonment loss, we followed the Driscoll rationale and noted that many major items of essential equipment were used in the revised design of the facility.
Where, as in Wah Chang, the taxpayer, after a revised plan of construction is effected, still makes use of essential equipment and materials used in the *396 original plan, a major obstacle to the deductibility of abandoned materials and plans is presented. In Haspel v. Commissioner, 62 T.C. 59 (1974), affd. per order (8th Cir. March 20, 1975), we denied a deduction for the cost of abandoned architectural and interior design plans. The plans were abandoned only after the foundation of a hotel building was constructed and it was discovered that the plan for the superstructure, as designed by the original architects, was too costly. A new design for the superstructure was prepared by a different firm of architects. Since the foundation of the building as designed by the first architects, was used in the hotel as built, we disallowed the deduction for abandoned superstructure plans. Regardless of a major change in design, we held that there was one ongoing project of construction and its costs must be capitalized. We are aware of cases which have allowed deductions for contruction materials and building plans which were abandoned. In Buedingen v. Commissioner, 6 B.T.A. 335 (1927), deductions were allowed for abandoned building plans and specifications for a factory. The plans were of no aid in the eventual construction of the building. *397 Dresser Manufacturing Co. v. Commissioner, 40 B.T.A. 341 (1939), resulted in a holding that the taxpayer could deduct the costs attending the construction of two gas compressor engines. Both engines proved to be defective and were scrapped. None of the materials or plans associated with the two engines were used in subsequent manufacture. Nor did the engines have any salable value. Accordingly, the losses on the engines were allowed as the taxpayer "had nothing whatever to show for [its] efforts." Thus, in both Buedingen and Dresser the crucial factor for the allowance of the deduction was that none of the materials or plans attending an original construction were used in a subsequent project. [19]
Petitioners have scrapped significant materials in their efforts to convert a motel under construction into an office building. Yet much of the work on the first floor of the building was maintained and used in the building's redesign. Petitioners' own construction project was thus not entirely scrapped and we therefore believe that all costs of the project must be capitalized despite petitioners' modification *398 in building plans.Section 263(a). [20] EXCISSIVE COMPENSATION On March 2, 1972, petitioners entered into an employee agreement with OEP pursuant to which the corporation would pay each petitioner an annual base salary of $ 35,000. The agreement also provided that a cash bonus could be paid to petitioners if they had contributed substantially to the success of the corporation and in this regard a bonus incentive plan was annexed to the agreement. Petitioners, who were the sole shareholders of OEP and comprised two-thirds of its Board of Directors, were each voted bonuses of $ 200,000 in 1972 which were paid in September of 1973.
Section 1348 (a) provides generally that earned income shall not be subject to tax in excess of a 50 percent rate. Section 1348(b)(1)(A) defines "earned income" as "any income which is earned income within the meaning of * * * section 911 (b)." Section 911(b) defines earned income as follows: "* * * wages, salaries, *399 or professional fees, and other amounts received as compensation for personal services actually rendered, but does not include that part of compensation derived by the taxpayer for personal services rendered by him to a corporation which represents a distribution of earnings or profit rather than a reasonable allowance as compensation for the personal services actually rendered." Section 162(a)(1) allows a corporation a deduction for all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business including a reasonable allowance for salaries or other compensation for personal services actually rendered. In this regard, section 1.162-7(b)(3), Income Tax Regs., provides as follows: In any event the allowance for the compensation paid may not exceed what is reasonable under all the circumstances. It is, in general, just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances. The circumstances to be taken into consideration are those existing at the date when the contract for services was made, not those existing at the date when the *400 contract is questioned. Sections 1.162-7 and 1.162-8, Income Tax Regs., discuss the circumstances of a corporation having few shareholders. If it is determined that salaries are excessive and the excessive payments bear a close relationship to the stockholdings of the officers or employees, it would then seem likely that the salaries are not paid wholly for services rendered, but that the excessive payments are a distribution of earnings upon the stock and as such are to be treated as a dividend. Respondent contends that the $ 200,000 bonus received by each petitioner in 1973 represents excessive compensation which should be treated as a dividend by its recipients and thus the maximum tax on earned income may not be availed of by petitioners. Respondent's allegation of petitioners' receipt of excessive compensation first appears in his amended answer to the petition. Thus, it is respondent who bears the burden of proof on this issue. Rule 142(a), Tax Court Rules of Practice and Procedure; Florists' Transworld Delivery Association v. Commissioner, 67 T.C. 333 (1976). We initially note that respondent has not submitted any evidence relating to the earnings and profits of OEP for *401 the year 1973 in which the cash payments were made to petitioners. Respondent has submitted the corporate tax return for 1972 which indicates that OEP had a significant surplus on September 30, 1972. Nevertheless, we may not conclude from this alone that earnings and profits in a sufficient amount existed in 1973 to treat the cash payments to petitioners as dividends. We note that the surplus on September 30, 1972, was not enough to treat the entire $ 400,000 received by petitionrs in 1973 as dividends. Furthermore, even if such prior year's surplus was greater than amounts distributed to petitioners in the following year, OEP's operation at a deficit in 1973 would serve to wipe out the accumulated earnings before any calculation of dividend distributions could be made. See section 1.316-2(b), Income Tax Regs. See also Steel Improvement and Forge Co. v. Commissioner, 36 T.C. 265 (1961), revd. on other grounds, 314 F.2d 96 (6th Cir. 1963) and Rev. Rul. 74-164, 1974-1 C.B. 74. Thus, we cannot hold that any payments to petitioners in 1973 were dividend distributions. Nevertheless we have reviewed the parties' arguments directed to the excessive compensation issue and are convinced *402 that a portion thereof was not for services actually rendered by petitioners. This conclusion is based on our analysis of the reasonableness of the amount of compensation paid to petitioners coupled with the fact that the corporation was wholly-owned by petitioners.
The reasonableness of compensation is a question of fact which must be answered on the basis of all the circumstances attending a particular case. Levenson & Klein, Inc. v. Commissioner, 67 T.C. 694 (1977); Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner, 61 T.C. 564 (1974), affd. 528 F.2d 176 (10th Cir. 1975). The amount of compensation flowing to a shareholder from a closely held corporation is to be carefully scrutinized for its reasonableness. Perlmutter v. Commissioner, 44 T.C. 382 (1965), affd. 373 F.2d 45 (10th Cir. 1967). The factors generally considered relevant in determining the reasonbleness of compensation include: the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions *403 to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. * * * [Mayson Mfg. Co. v. Commissioner, 178 F.2d 115, 119 (6th Cir. 1949), revg. a Memorandum Opinion of this Court.] Although we discuss only those factors upon which we place the greatest reliance, our conclusion is the result of evaluating the entire situation of the instant case in light of all of the above factors. No single factor is determinative. Mayson Mfg. Co. v. Commissioner, supra; Kennedy v. Commissioner, 72 T.C. 793 (1979). The evidence clearly indicates that petitioners did indeed render valuable services to OEP. Petitioners, in addition to general managerial tasks, were responsible for construction, procured financing without payment to a mortgage broker and successfully acquired tenants for their office buildings. Respondent has asserted that approximately $ 36,000 was reasonable compensation in 1973 for petitioners' managerial positions. However, we take note *404 that in the years immediately preceding the years in issue, petitioners accepted more modest salaries to further the possibility of future prosperity.It is well settled that a determination of whether current compensation is reasonable may be based on an evaluation of both current services and undercompensated past services. Cf. Lucas v. Ox Fibre Brush Co., 281 U.S. 115 (1930); R.J. Nicoll Co. v. Commissioner, 59 T.C. 37 (1972). Petitioners, through their experience and skill, were able to engage OEP in construction operations without the necessity of paying a contractor's commission. Costs of these construction operations were approximately $ 2,091,000 and a normal contractor's commission would approximate 10 percent of this figure. Additionally, petitioners acquired leases for the corporation which resulted in rental income of $ 95,000 to OEP. The corporation did not pay the usual commission to a real estate broker for acquisition of the leases. Considering petitioners' unique experience in the industry and the fact that they were licensed real estate brokers, we consider 10 percent of the gross rental as a component of reasonable compensation to petitioners. Accordingly, *405 and in view of respondent's studies indicating that $ 36,000 was reasonable compensation for the performance of the general managerial tasks inherent in each petitioners' employment, we hold that $ 145,000 paid to each petitioner constitutes reasonable compensation for services rendered. With respect to amounts over and above $ 145,000 paid to each petitioner, we believe respondent has adequately borne his burden of proof that such amounts were not for services rendered. Respondent points to the fact that petitioners devoted only part of their 70-hour work week to OEP as petitioners were involved in numerous business ventures. Respondent also highlights OEP's lack of prior dividend distributions. Thus we hold that payments in excess of $ 145,000 to each petitioner were not for services rendered and therefore such amounts are not subject to the maximum tax on earned income provided by section 1348.[21] *406 SALE/GIFT TO ORANGE COUNTY The next issue confronting us arises out of a set of transactions resulting in a sale and alleged gift of continguous parcels of property by petitioners through their partnership to Orange County, Florida. The series of events leading to the transfers are set out in our findings of fact and will not be repeated herein. Petitioners' first contention is that the sale and gift transactions to Orange County should be viewed in their entirety as one transaction in the form of a bargain sale to a charitable entity. Thus, they argue that 53.3 acres of land worth $ 425,000 were sold to the county for $ 212,500 with no conditions attached thereto and without any additional economic benefits flowing back to them therefrom. Therefore, they claim that the excess of value over cash consideration received ($ 212,500) was a gift to the county. Alternatively, petitioners assert that the transfer of the gifted parcel was a binding obligation upon petitioners regardless of whether or not the county purchased the continguous *407 parcel. As such, petitioners received no quid pro quo and the value of the gifted portion, which petitioners claim is $ 212,500, is allowable as a charitable contribution under section 170. Respondent vigorously disputes petitioners' valuation of the properties transferred to Orange County.He asserts that the value of the entire 53.3 acre tract was $ 61,000 and thus no bargain sale of proprty to the county existed. It is respondent's position that petitioners allegedly donated a parcel of land for the purpose of receiving $ 212,500, an amount which greatly exceeded the value of property transferred to Orange County. Additionally, respondent asserts that petitioner Malcolm Clayton expected zoning changes and sewer hookups as a result of petitioners' donation.
Section 170(a) allows a deduction for any charitable contribution payment of which is made within the taxable year.Contributions to political subdivisions fall within the ambit of section 170 if the gift is made for exclusively public purposes. Section 170(c)(1). We initially note the judicial hesitancy in applying the "detached and disinterested generosity" test enunciated in Commissioner v. Duberstein, 363 U.S. 278 (1960) *408 to cases where business entitles make chartiable contributions and are claiming deductions under section 170. Stubbs v. United States, 428 F.2d 885 (9th Cir. 1970), cert. denied 440 U.S. 1009 (1971); United States v. The Jefferson Mills Inc., 367 F.2d 392 (5th Cir. 1966); Singer Co. v. United States, 196 Ct. Cl. 90, 449 F.2d 413 (1971), Duberstein dealt with whether receipt of an automobile was properly excludable from gross income as a gift under section 102(a). In DeJong v. Commissioner, 309 F.2d 373 (9th Cir. 1962), affg. 36 T.C. 896 (1961), the Ninth Circuit indicates that the test for section 102(a) gifts was applicable to charitable contributions under section 170. The same court later announced that within a business context a requirement of detached and disinterested generosity would tend to deny most charitable contributions made by corporations and partnerships as allowable deductions. United States v. Transamerica, 392 F.2d 522 (9th Cir. 1968).In Transamerica the court in disallowing a deduction under section 170 addressed itself to the direct economic benefit which flowed to the corporation as a result of its contribution. In so doing the court viewed as inappropriate *409 a rule which would demand of a corporate entity such impulses as affection, respect, or admiration. See Robertson v. United States, 343 U.S. 711 (1952). In Singer Co. v. United States, supra, where a corporation sold sewing machines to charities at substantial discounts the Court of Claims adopted a quid pro quo test and stated: It is our opinion that if the benefits received or expected to be received, are substantial, and, meaning by that, benefits greater than those that inure to the general public from transfers for charitable purposes (which benefits are merely incidental to the transfer) then in such case we feel the transferor has received, or expects to receive a quidproquo sufficient to remove the transfer from the realm of deductibility under section 170. * * * [supra at 423.] We have previously cited the Singer rule with approval. Louisville & Nashville Railroad Co. v. Commissioner, 66 T.C. 962 (1976). We will therefore proceed to apply it in the instant case. Petitioners sold and gifted two contiguous properties to Orange County. While technically two transfers were involved, after a careful review of the record, we are convinced that the sale and gift of property *410 to Orange County should be viewed as one transaction. The loan acquired by petitioners for the original purchase of the property from the Hall Estate was conditioned upon the subsequent purchase of property from petitioners by Orange County. Simultaneous appraisals on the two parcels were requested by petitioners. Both properties were deeded to Orange County on September 12, 1973. Thus it is evident that the transfer of two tracts of land should be viewed as one transaction and we thereby dismiss petitioners' contention that they had a binding obligation to make a gift irrespective of whether a sale was to be consummated. It therefore is necessary to decide whether a bargain sale to the county occurred. Such a discussion by its nature is interwoven with the issue of the benefits received by petitioners from the transaction, i.e., whether a quid pro quo was exacted by petitioners. Have petitioners derived any economic benefit from this integrated transaction? Although petitioners did not receive or expect to receive any favorable treatment with regard to zoning changes or sewer hookups, we believe that the conveyance has resulted in a cash benefit to petitioners which exceeds *411 the value of the properties transferred. We have so concluded after analyzing the valuations urged upon us by the parties. With the exception of several acres, both tracts conveyed had heavy muck deposits making development either impossible or prohibitively expensive. The low water level further aggravated the problems of a would-be developer. We think that even petitioners at an early stage realized that development of the areas which encompassed most of the transferred acreage was not to be profitably accomplished. In their plan of annexation submitted to the city of Winter Park before petitioners' acquisition of the property, petitioners' planner, Mr. Helie, portrayed only a very small segment of the property which would be developed by petitioners with homes. The remainder was to be used for hiking and bicycling.In addition, a U.S. geological survey formulated in 1970 shows that the property was located in a flood prone area. More particularly, we feel that the above factors do not justify the use of certain comparable sales in Mr. Pardue's appraisal report. Mr. Pardue cited development of condominiums and townhouses at the highest and best use of the subject property. *412 Thus, he used other sales with purportedly similar highest and best uses to arrive at a valuation of $ 425,000 for the approximately 53 acres. We agree with respeondent to the extent that the heavy muck and low water level were not conductive to the building of condominiums and townhouses. Furthermore, Mr. Pardue compared the undeveloped property transferred to Orange County to lands which already met with engineering costs, attorneys fees, and other expenditures required for development. Several of the sales cited by Pardue in his report related to land tracts in excess of 10 miles away from the Cross Creek property. For these reasons, we do not believe that the sales used by Mr. Pardue in support of his appraisal were comparable to the sale of the Cross Creek property and as such, we decline to adhere to his conclusion. As further support for our rejection of petitioners' valuation, we note the Federal audit conducted concerning the transfer of Federal moneys through State and County governments for the establishment of the Orange County park. This audit specifically recommended a $ 425,000 cost adjustment directly resulting from its conclusion that the local government accepted *413 an inadequate appraisal. We are persuaded that the highest and best use of the Cross Creek property was as a drainage basin or alternatively as a nature study park. We do not believe that these heavy muck lands provided a fertile source of development. Yet both petitioners' and respondent's appraisals reflect that some portion of the tract contained no muck and was safely above the flood plain. Using a valuation of developable land in the area cited by respondent in his appraisal report, we hold that eight acres of the 53.3 acre tract are to be valued at $ 10,000 per acre. As to some 45.3 acres we uphold respondent's determination of a value of $ 1,150 per acre. Thus, the aggregate value of properties transferred by petitioners to Orange County was $ 132,095. Consequently, no bargain sale occurred and petitioners are not entitled to a charitable contribution. Our holding with respect to the conveyances to Orange County raises the issue of how petitioners are to treat the gain realized on the sale of 53.3 acres of land. [22] Petitioners contend that they intended to develop rental properties thereon and should therefore be accorded capital gains treatment. Respondent asserts that *414 the acreage was sold in the ordinary course of petitioners' business and ordinary income should therefore result. The parties have advanced detailed analyses addressing the issue of whether the entire Cross Creek property as purchased by petitioners from the Hall Estate (127 acres) was to be developed with single family houses or with multiple family dwelling units. Yet we think any such discussion is irrelevant to the issue before us. Petitioners' development plan does not relate to the tracts sold to Orange County. The record clearly indicates that petitioners both before and after their acquisition of the entire 127 acres intended to resell at least 40 acres to Orange County.The loan agreement entered into by petitioners and Great American Mortgage Investors clearly recites *415 this fact. Petitioners never had any intent of developing subsequently sold tracts with either single family or multiple family dwelling units. Thus, in light of petitioners' steadfast desire to sell the acreage to Orange County, the issue more narrowly framed is whether the contemplated sale by petitioners was in the ordinary course of its business.
Section 1221(1) excepts from the definition of capital asset the stock in trade of the taxpayer or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. The Supreme Court in Malat v. Riddell, 383 U.S. 569 (1966) indicated that this exception to capital asset status is to differentiate between gain derived from the everyday operation of a business and gain derived from assets that have appreciated in value over a substantial period of time. However, a property sale contemplated at the time of acquisition does not automatically result in a determination that the property was held primarily for sale in the ordinary course of business. McManus v. Commissioner, 65 T.C. 197 (1975); Howell v. Commissioner, 57 T.C. 546 (1972); Dunlap v. Oldham Lumber Co, 178 F.2d 781 (5th Cir. 1950). *416 Since we have found that petitioners never intended to develop rental units on the parcels actually sold, capital gains treatment could be accorded to this sale only if petitioners held the property for appreciation to be realized over a period of time.
Investment property is to be distinguished from stock in trade, or property bought and sold for a profit. Brown v. Commissioner, 448 F.2d 514 (10th Cir. 1971), affg. 54 T.C. 1475 (1970); Wiseman v. Halliburton Oil Well Cementing Company, 301 F.2d 654 (10th Cir. 1962). Faced with this classification question on innumerable occasions, the courts have adopted several well recognized tests. Among others, these tests include: (1) the purpose for which the asset was acquired; (2) the frequency, continuity and size of the sales; (3) the ctivities of the seller in the improvement and disposition of the property; (4) the extent of improvements made to the property; (5) the proximity of sale to purchase; and (6) the purpose for which the property was held during the taxable years. Howell v. Commissioner, supra; Pointer v. Commissioner, 48 T.C. 906 (1967). See Biedenharn Realty Co. v. United States, 526 F.2d j09 (5th Cir. 1976). However, *417 these factors have no independent significance and only form part of the entire situation presented. United States v. Winthrop, 417 F.2d 905 (5th Cir. 1969); McManus v. Commissioner, supra.Moreover, within such a series of tests, individual factors have varying weights and magnitudes, depending on the facts of a case.Biedenharn Realty Co. v. United States, supra.
Respondent initially raised this issue in an amended answer to the petition and he therefore bears the burden of proof on this issue. Rule 142(a), Tax Court Rules of Practice and Procedure. Considering the transaction in its entirety, we believe respondent has shown that petitioners' sale to Orange County was in the ordinary course of business. We note that petitioners acquired the property for resale. Petitioners' loan agreement with Great American Mortgage Investors provided for repayment of $ 475,000 within 1 year. Petitioners, even prior to their own acquisition of the property, were aware that their profit on the land was to result from their dealings with Orange County and not because of any significant appreciation in the value of the land over a substantial period of time. It is clear that petitioners did *418 not deed the tracts to Orange County until 11 months had expired from the time of petitioners' purchase. Yet petitioners were not holding the property in that period for substantial appreciation. We think it far more reasonable to assume in this case that the 11 month holding period was necessary so that appraisals could be performed, government bodies would have ample time to deal with administrative detail, and petitioners could acquire a long-term holding period [23] in their quest for favorable tax treatment. [24] *419 Although petitioners' partnership was engaged in the development of real estate, occasionally it sold some of its unimproved lots to other builders. Moreover, in another year in issue they made a similar sale to the Winter Park Church of Religious Science, Inc. Thus, petitioners' business included sales of unimproved realty. Having so decided, it is also apparent that the lack of improvements to the land is not a factor to be considered in this case. [25]
Moreover, viewing the transaction in its entirety, we are convinced that the sale to Orange County *420 was in the ordinary course of business. One hundred and twenty-seven acres were bought from the Hall Estate of which only a portion could be developed. It seems clear to us that petitioners viewed the sale to Orange County as an integral part of a profit making business transaction.We are aware that a real estate business may hold real property for investment. Pritchett v. Commissioner, 63 T.C. 149 (1974); Maddux Construction Co. v. Commissioner, 54 T.C. 1278 (1970); Rouse v. Commissioner, 39 T.C. 70 (1962). However, we refuse to accord investment status to the sold properties where it appears that they were the key elements in the acquisition of land more suitable for development in the petitioners' business. More particularly, the fact that petitioners' financing for their own acquisition was conditioned upon a subsequent sale of at least 40 acres convinces us that this business transaction may never have been consummated without assurances that condemnation proceeds would be forthcoming from Orange County. We therefore believe that as a significant element in the acquisition of developable land for the real estate partnership, the sale to Orange County should be viewed as *421 in the ordinary course of the partnership's business and not as an investment whose benefits are realized through future appreciation of value. SALE/GIFT TO WINTER PARK CHURCH The next issue bears great similarity to our prior discussion on the sale by petitioners to Orange County. Therefore repetition of the law as it relates to charitable transfers will be avoided where possible. A brief summary of the pertinent facts reveals that on February 6, 1974, petitioners, as a result of prior contact with the Winter Park Church of Reliqious Science, Inc., received a proposal from the church to purchase approximately two acres of land with an agreement that petitioners make a gift of additional acreage. The contract of sale, however, reworded the proposal in order to give the Church an option to rescind the agreement if no gift was made by petitioners by the proposed closing date.On June 18, 1974, a 1.87 acre parcel was sold for $ 63,000 to the church and a.91 acre tract contiguous to the sold parcel was gifted to the church by petitioners. Despite the altered agreement, we are convinced that no separate gift and sale transaction took place. The properties were conveyed simultaneously *422 and it is clear from the initial proposal by the Winter Park Church that the entire transaction involved a transfer of two parcels of land rather than two separate independent transfers. Accordingly, the transaction in its entirety involved a sale of 2.78 acres to the Winter Park Church for $ 63,000. So construed, petitioners' charitable deduction hinges upon the valuations of the tracts transferred. Respondent concludes that the prevailing zoning regulation in the area dictates single family residential use and that this therefore represents the highest and best use of the property. He indicates that the value of the 2.78 acres is $ 51,500. Petitioners have performed separate appraisals for the sold and allegedly gifted tract. In each appraisal they cite church use as the highest and best use of the land. The appraisals specify a combined value of $ 97,000 for both tracts. Petitioners' assertion is based on the notion that the relatively small size of each tract (.91 and 1.87 acres) makes them inefficient for single family residential lots. We disagree. First, we note that the contiguous properties should be viewed in the aggregate as a 2.78 acre parcel and not as two separate *423 tracts of.91 and 1.87 acres. Second, it is apparent that 2.78 acres is not too small a tract of land to efficiently develop single family residences.Moreover, we believe that at least six and eight single family units could readily be erected on acreage of this size.Third, we are aware that petitioners' appraisals were performed after the sale to the Winter Park Church. Thus, in light of the prevailing single family residential zoning in the area, we are inclined to think that an assertion of the highest and best use as a church is inaccurate and merely self-serving. In any event, petitioners allegedly comparable sales cited in their reports are based on several sales in different locations, sales of property with dissimilar zoning regulation and conveyances of property in a more developed condition. We therefore view the cited sales in support of petitioners' valuation as incomparable to the tracts sold to the Winter Park Church. We uphold respondent's determination that the value of the 2.78 acres is $ 51,500. Having first raised the issue of the alleged sale and gift in an amended answer to the petition, respondent bears the burden of proof on this issue. [26]Rule 142(a), Tax Court Rules of Practice and Procedure. *424 We believe that burden has been sustained as respondent's appraisal cites the proper highest and best use of the property and uses comparable sales which are near the subject tract and are adjusted for any significant size differences. Accordingly, we hold that petitioners are not entitled to a deduction under section 170 for the transfer of property to Winter Park Church. The issue of the character of petitioners' gain now surfaces. [27] *425 Not unlike the sale to Orange County, we believe that petitioners realized ordinary income of the sale to Winter Park Church. As our previous discussion points out, part of petitioners' business was the sale of unimproved realty and thus the instant sale was in the ordinary course of its business. LAND PLANNING COSTS Petitioners seek to deduct certain land planning costs relating to the development of the Cross-Creek property. From 1972 to 1974 they retained the services of numerous professional people to effect a Planned Unit Development (PUD) for the property. They assert that the plans were abandoned in 1973. As a result, their partnership, the Eastside Land Trust, deducted land planning costs of $ 25,747 in 1973 and $ 5,751 in 1974. Respondent argues that petitioners never abandoned the PUD concept in the years in issue and thus the deductions are improper. Alternatively, respondent suggests that even if the PUD had to be modified, the initial surveys, engineering studies, and planning fees were all an integral part of the continuous efforts by petitioners to develop the land.
There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. Section 165(a). Section 1.165-2(a), Income Tax Regs., provides in pertinent part: (a) Allowance of deduction.A *426 loss incurred in a business or in a transaction entered into for profit and arising from the sudden termination of the usefulness in such business or transaction of any nondepreciable property, in a case where such business or transaction is discontinued or where such property is permanently discarded from use therein, shall be allowed as a deduction under section 165 (a) for the taxable year in which the loss is actually sustained. * * * It is well settled that abandoned land planning costs are deductible. Haspel v. Commissioner, 62 T.C. 59 (1974); Moore v. Commissioner, 19 B.T.A. 140 (1930); Murphy Transfer & Storage Co. v. Commissioner, 7 B.T.A. 1148 (1927). In the instant case, the parties' dispute centers mainly on whether petitioners in fact abandoned the plans for the PUD and if so in what year. Having initially raised the issue in an amended answer to the petition respondent bears the burden of proof on this issue.Rule 142, (a) Tax Court Rules of Practice and Procedure. We hold that respondent has sustained his burden with respect to 1973 but not with regard to 1974. The record reveals that in June 1974 petitioners were still in contact with officials of the City of Maitland. *427 The Cross Creek property had been annexed into Maitland and at this point petitioners still envisioned a successful PUD. Furthermore, a memorandum from petitioners to their trustee, the Commercial Bank at Winter Park, dated June 26, 1974, directed that all costs related to the project incurred in 1972 and 1973 be written off in 1974. Thus, the only documentary evidence in support of petitioners' contention of abandonment, concerns a 1974 abandonment. Accordingly, we conclude that petitioners did not abandon their plans for the Cross Creek property in 1973 and are therefore not entitled to any abandonment losses on the property for that year. Respondent contends that even in 1974 there was no abandonment of the property. In an attempt to satisfy his burden of proof, respondent specifically points to a July 2, 1975 meeting of the Eastside Land Trust wherein it was resolved that on July 17, 1975, King Helie, petitioners' planning consultant, would present a new PUD program to the Orange County Planning and Zoning Board. However, this memorandum capsulizes petitioners' intent with respect to their Expressway Property and not with respect to the Cross Creek property. Considering *428 petitioners' concession concerning the Expressway Property (i.e., that plans for the Expressway were not abandoned in the years in issue), we hold that respondent has not met his burden of proof on the 1974 abandonment issue. Respondent has alternatively argued that the planning and engineering expenses incurred by petitioners became an integral and inseparable part of continuous efforts by petitioners to develop the Cross Creek property. He cites Haspel v. Commissioner, supra, which we believe respondent reads with far too broad a view. In Haspel a firm of architects was hired to design an entire building. After the foundation was constructed, it was determined by the taxpayers that the plans for the superstructure were too expensive and were thus abandoned. Subsequently, with the aid of other architects, a second superstructure was constructed upon the existing foundation.The taxpayers' deduction of the planning costs of the first superstructure was denied on the factual finding that the original plans for the foundation and superstructure constituted one asset as the architects were hired to design an entire building and not a foundation apart from its superstructure. Since *429 the foundation designed by the original architects which represented a significant amount of their work, was used in the hotel as built, it was held that all the original planning costs had to be capitalized despite the fact that much of the original work was abandoned. We think Haspel is clearly distinguishable from the instant case. Respondent has nowhere indicated that any portion of the PUD concept designed by King Helie was to be used in the eventual development of the Cross Creek property. It is in fact apparent that the design for a PUD is quite dissimiliar from the ordinary platting of property. Thus with respondent bearing the burden of proof, we are unwilling to hold that all plans for the development of the Cross Creek property constituted one asset. Rather, we hold that the PUD concept King Helie devised for petitioners was separate and apart from any other development plans and therefore could be deducted when abandoned rather than capitalized.See Buedingen v. Commissioner, 6 B.T.A. 335 (1927). SECTION 333 LIQUIDATION In October of 1974 petitioners made a binding election under section 333[27] *431 *432 *433 to liquidate Howell Hills, Inc. [28] The dispute between the parties concerns *430 the amount of gain to be properly reported by petitioners as dividends [29] *434 on the liquidation. The difficulty in making such a determination is focused upon the value of second mortgage notes received by petitioners as liquidating distributions from Howell Hills. The parties have stipulated that each petitioner had a basis of $ 200 in his Howell Hills stock. [30] *435 Each petitioner received $ 15,493 in cash upon the liquidation. Respondent, resting on little more than the presumption of correctness existing in his favor, has valued second mortgage notes totaling $ 16,810.34 received by each petitioner in the liquidation at their face amount. Petitioners claim that these mortgage notes are to be valued at 20 percent of their face amount. We agree with petitioners. Valuation is, of course, a question of fact. It is necessarily an approximation arrived at on such factors as reasonably bear on determining the price which would reasonably be paid by the hypothetical willing purchaser to the equally hypothetical willing seller who is under no compulsion to sell. Anderson v. Commissioner, 250 F.2d 242 (5th Cir. 1957). In determining fair market value, commercial realities must be given due consideration. Bar L. Ranch, Inc. v. Phinney, 426 F.2d 995 (5th Cir. 1970); Jack Daniel Distillery v. United States, 180 Ct. Cl. 308, 379 F.2d 569 (1967). In Bar L. Ranch the taxpayer was able to show that those liable on a mortgage note were insolvent. In the instant case, despite petitioners' inability to prove the insolvency of particular debtors, we note that their debtors generally were unable to make the entire downpayment on purchases of homes and thus second mortgage notes were executed between the debtors and the corporation owned by petitioners. Mortgagors were often delinquent in making mortgage payments. It is therefore apparent that more than a slight degree *436 of risk was attached to the second mortgage notes. Furthermore, the mortgage period on the notes distributed in liquidation extended up to 30 years. Another factor resulting in a discounted value for the notes is their relatively low interest rates. Some notes, although secured by real estate, had mortgage balances of relatively small amounts making foreclosure proceedings economically impractical. Even assuming that financial concerns would not preclude a foreclosure sale, the overbuilding which resulted in the Orlando area from the opening of the Disney World complex posed a great threat to a fruitful foreclosure sale. For the foregoing reasons we hold that the second mortgage notes received by petitioners upon the liquidation of Howell Hills, Inc. should be valued at 20 percent of their face amounts. SECTION 6651 ADDITION TO TAX Petitioners filed untimely 1973 income tax returns. Respondent, in his notice of deficiency, determined that petitioners are subject to the section 6651 addition to tax for 1973 for failure to file timely returns. Petitioners assert that such failure was due to reasonable cause. They ground this contention on the basis that their accountant left *437 their employ, resulting in a delay in the preparation of schedules and that complex audit adjustments to partnership returns for prior years affected the preparation of their 1973 returns. Furthermore, petitioners argue that they relied on counsel to file timely returns and therefore their delinquency should be excused. Section 6651(a)(1)[31] *438 imposes an addition to tax for failure to file a timely return in the amount of 5 percent per month of the net amount due [32] *439 not to exceed 25 percent.Through an affirmative showing that the delinquency was due to reasonable cause and not to wilful neglect, the taxpayer can avoid the addition. If the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time, then the delay is due to a reasonable cause.The taxpayer must make an affirmative showing of all facts alleged as a reasonable cause for his delinquency. Section 301.6651-1(c)(1). Procedure and administrative Regs.; BJR Corporation v. Commissioner, 67 T.C. 111, 131 (1976). The general rule is that the filing of a timely return is a personal duty of the taxpayer and blind reliance on counsel to so file does not constitute reasonable cause for delinguency. Logan Lumber Co. v. Commissioner, 365 F.2d 846 (5th Cir. 1966), affg. a Memorandum Opinion of this Court; Latham Park Manor Inc. v. Commissioner, 69 T.C. 199, 219 (1977), affd. 618 F.2d 100 (4th Cir. 1980); Bradley v. Commissioner, 57 T.C. 1 (1971). An exception to this rule permits the taxpayer to show that he acted in good faith reliance upon the professional advice of competent tax counsel regarding a question of tax law *440 and to whom full disclosure of relevant facts were made. Paula Construction Co. v. Commissioner, 58 T.C. 1055 (1972); West Coast Ice Co. v. Commissioner, 49 T.C. 345 (1968). We do not believe petitioners fall within this exception. First we note that petitioners signed original requests for extension of time to file, thus evidencing the fact that petitioners were well aware that timely returns had to be filed. Second, the record is barren of any evidence tending to support the assertion that good faith reliance on competent counsel was resorted to by petitioners. Moreover, Mr. James Johnson, who prepared petitioners' tax returns, acknowledged that he was not a "great tax accountant." Thus, we are unable to discern upon what competent counsel petitioners allegedly relied. Petitioners further argue that an accountant who was responsible for the production of certain schedules relating to the Diplomat Motel, had left the employ of petitioners thereby causing their delinquency. The record, however, does not even clearly indicate the name of this accountant, his qualifications, or when he left petitioners' employ. We therefore reject this contention. Furthermore, what does emerge *441 from the record is that when petitioners filed their second extension for time to file returns, they, either personally or through Mr. Johnson, were aware that financial information regarding the Diplomat Motel was the only data that was still necessary in order to file a complete return. Using this as an excuse, a second extension of time was applied for and granted. The record does not disclose that petitioners subsequently made any attempt to alleviate the problem or to alert the Internal Revenue Service of their predicament in meeting the deadline provided by the second extension of time for filing returns. Additionally, the record is absent of any convincing evidence tending to show the vast complexity of petitioners' partnership income tax returns. Accordingly, petitioners' final argument relating to the complex adjustments necessary on partnership returns does not persuade us that petitioners had reasonable cause to file untimely returns. We have reviewed the cases cited by petitioners on this issue and find them either distinguishable or misapprehended by petitioners. For the foregoing reasons, we sustain respondent's determination that petitioners are liable for the *442 5 percent addition to tax for 1973 pursuant to section 6651(a)(1). SECTION 6653 ADDITION TO TAX Respondent determined that petitioners were liable for additions to tax for 1973 and 1974 under section 6653(a). [33] Petitioners bear the burden of proving that the imposition of this addition is erroneous. Enoch v. Commissioner, 57 T.C. 781 (1972); Marcello v. Commissioner, 43 T.C. 168, 182 (1964). Petitioners' principal argument is that any underpayment resulted from their reliance upon counsel and not from any negligence or intentional disregard of the rules and regulations. They also claim that the claimed deficiencies are based upon complex legal and factual questions, thus negating any inference *443 that negligence or disregard of the law provoked the underpayments. For the reasons set forth below, we believe petitioners have failed to carry their burden of proof and therefore respondent's determination is sustained. Generally, the duty of filing accurate returns cannot be avoided by placing responsibility on an agent. Pritchett v. Commissioner, 63 T.C. 149 (1974); Soares v. Commissioner, 50 T.C. 909 (1968); American Properties Inc. v. Commissioner, 28 T.C. 1100 (1957). Although some cases have allowed taxpayers to sidestep the negligence addition where complete information was furnished to competent counsel, we believe this exception is inapplicable to petitioners. See Industrial Valley Bank and Trust Co. v. Commissioner, 66 T.C. 272 (1976); Woodbury v. Commissioner, 49 T.C. 180 (1967). Petitioners' alleged reliance on their accountant James Johnson, by whose own admission was not proficient in tax matters, cannot by itself relieve petitioners of their responsibility to file accurate returns. Furthermore, the record does not indicate that petitioners even made inquiry of those upon whom they relied. We are also unaware of the names and qualifications of any other counsel *444 upon which petitioners might have relied. Thus we are unpersuaded by petitioners' assertion of reliance upon counsel.
Petitioners' alternative argument relating to the complexities of legal and factual issues constituting the underpayment is equally unpersuasive. We are certainly not unaware that some of the issues in this case have indeed involved technical legal questions and intricate fact patterns. Yet the statute mandates that a 5 percent addition be imposed if any part of the underpayment results from negligence or intentional disregard of the rules and regulations. Petitioners, who have been in the real estate business for numerous years, claimed excessive first year depreciation and used erroneous methods of depreciation on several motel buildings in both 1973 and 1974. We presume that petitioners, as sophisticated entrepreneurs, were or should have been aware of the rules and regulations concerning these matters. If they were not, then at least they should have made inquiry of competent counsel to ascertain the propriety of these deductions. The record further reveals that in 1973 petitioners claimed a $ 25,000 interest expense representing the cost of obtaining a loan. *445 Such cost should have been capitalized and deducted ratably over the length of the mortgage. Furthermore, petitioners, as equal owners of a real estate management operation, each deducted 100 percent of the rental losses incurred by the operation in 1974.While each of the errors noted herein might be excusable when standing alone, viewing the record in its entirety we hold that part of the underpayments in 1973 and 1974 was due to negligence or the intentional disregard of the rules and regulations and accordingly petitioners are liable for the section 6653(a) additions to tax. Decisions will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended.
*. Included on tax return as Built-in and other furnishings.↩
*. Taxpayers' error in transfer to summary as noted in RAR.↩
2. These composite lives assigned to buildings by respondent's agents and engineers and those calculated by respondent from petitioners' depreciation schedules are derived by determining the amount of one year's depreciation for each component of the building using the useful life for such component, and then by dividing the total amount thus obtained for all the components by the total cost of all components in the account. See Rev. Rul. 68-4, 1968-1 C.B. 77↩, 78. Although respondent introduces these calculations to show the unreasonableness of useful lives employed by petitioners the study, in effect, does no more than reassert respondent's view that the useful lives assigned to components by petitioners were excessively short. This is because a crucial element in the determination of composite life is the useful life that is initially assigned to each component.
3. The term taxable income as used in the bonus incentive plan did not include deductions for profit sharing contributions and income taxes.↩
4. The $ 485,915 in salaries was derived as follows: ↩
Charles W. Clayton
$ 236,000
W. Malcolm Clayton
236,000
Willa Norwood
13,915
$ 485,915
5. The partnership reported the value of the gift as $ 200,000 pursuant to the Pardue appraisal despite the consolidation of appraisals alluded to in our findings which assigned a value of $ 212,500 to the gifted property.↩
6. Although the Eastside Land Trust deducted $ 35,000 as the value of the land allegedly donated, petitioners now contend that such parcel had a value of $ 34,000. Pardue's appraisal of the entire tract transferred was $ 97,000, $ 66,000 for the "sold" portion and $ 31,000 for the "donated" portion. Petitioners have inexplicably reallocated the $ 97,000 appraisal so as to ascribe $ 63,000 to the "sold" parcel and $ 34,000 to the "donated" parcel. 7. The trust actually reported $ 48,960 net long-term capital gain. For reasons not apparent from the record respondent asserted and petitioners admitted that the gain reported by the trust was $ 44,550.↩
8. In 1966 the stock owned by Hargis was acquired by Mr. Hollis Scott. Subsequently a lawsuit arose between the Claytons and Scott. After a trial court rendered a judgment in favor of Scott, a settlement, resulted wherein petitioners paid $ 31,726 for the surrender of Scott's stock in Howell Hills. Twelve thousand dollars of the $ 31,726 was allocated by petitioners to the cost of acquiring the stock and the remaining $ 19,726 was allocated to costs of litigation. The issue of the basis of petitioners' stock in Howell Hills was nowhere addressed in the petition. Considering this and the fact that the parties have stipulated that the basis of the stock was $ 200 for each petitioner in the year in issue, we have ruled that evidence presented as to the basis of the stock r aised a new issue and was therefore untimely.↩
9. Exhibit 53-BA of the record is a copy of Form 996 (Corporate Dissolution or Liquidation) filed for Howell Hills. Included with that exhibit is a schedule of dissolution which lists each petitioner's gain as $ 32,103.75. However, each petitioner reported a long-term capital gain of $ 16,810.34 on the liquidation of Howell Hills. The record does not indicate how petitioners arrived at the reported amount. ↩
10. Respondent calculated each petitioner's gain as follows: Amounts received upon liquidation: ↩
Cash
$ 15,493.41
Notes
16,810.34
32,303.75
Less stock basis
200.00
Gain on liquidation
$ 32,103.75
11. This issue initially involved allegedly abandoned land planning costs pertaining to petitioners' Cross Creek and Expressway properties. On their 1973 and 1974 returns petitioners' partnership deducted $ 25,747 and $ 5,751 respectively as abandonmet losses on the Cross Creek property. With respect to the Expressway property the record reveals that in 1973 and 1974 the partnership deducted $ 37,986 and $ 14,760 respectively as abandonment losses. In light of petitioners' subsequent concession that costs relating to the Expressway property should be capitalized, the current dispute focuses on the $ 25,747 deducted in 1973 and on $ 5,751 deducted in 1974.
12. These two extensions of time to file returns were obtained in addition to the automatic 2-month extension of time allowed to taxpayers under section 1.6081-4, Income Tax Regs.↩
13. The name of this accountant does not appear in the record. See p. 115, infra↩.
14. Petitioners actually adjusted their depreciation schedules twice. In November of 1975 they filed amended returns for the years in issue. These amended returns ascribed 10-year useful lives to most building shells as compared with 20-year lives as originally reported. Subsequently, petitioners revised their depreciation schedules assigning longer useful lives to building shells. However, this revision also reallocated costs originally assigned to the building shells to other components with short useful lives.↩
15. At trial the parties stipulated that petitioners in their opening brief would explain how prior depreciation figured in their revised schedules. However, on brief petitioners have not so explained the effect of depreciation deductions taken in prior years.↩
16. Although both petitioners and respondent address their attention to petitioners' original tax returns for the years in issue, it is noteworthy that petitioners submitted amended tax returns for the years in issue in November of 1975. On these returns petitioners generally reduced the useful lives of buildings from 20 to 10 years without breaking out any more components from building shells than on their original returns. See footnote 14.
17. Both petitioners and respondent have termed this issue an abandonment. There is some overlap in the areas of abandonment and demolition. However, because section 1.165-3, Income Tax Regs.↩, refers speciically to demolition of buildings, we have elected to regard the issue as one of demolition rather than one of abandonment.
18. Section 1.167(a)-8. Retirements. (a) Gains and losses on retirements. For the purposes of this section the term "retirement" means the permanent withdrawal of depreciable property from use in the trade or business or in the production of income. The withdrawal may be made in one of several ways. For example, the withdrawal may be made by selling or exchanging the asset, or by actual abandonment.In addition, the asset may be withdrawn from such productive use without disposition as, for example, by being placed in a supplies or scrap account. The tax consequences of a retirement depend upon the form of the transaction, the reason therefor, the timing of the retirement, the estimated useful life used in computing depreciation and whether the asset is accounted for in a separate or multiple asset account. Upon the retirement of assets, the rules in this section apply in determining whether gain or loss will be recognized, the amount of such gain or loss, and the basis for determining gain or loss: (1) Where an asset is retired by sale at arm's length, recognition of gain or loss will be subject to the provisions of sections 1002, 1231, and other applicable provisions of law. (2) Where an asset is retired by exchange, the recogntion of gain or loss will be subject to the provisions of sections 1002, 1031, 1231, and other applicable provisions of law. (3) Where an asset is permanently retired from use in the trade or business or in the production of income but is not disposed of by the taxpayer or physically abandoned (as, for example, when the asset is transferred to a supplies or scrap account), gain will not be recognized. In such a case loss will be recognized measured by the excess of the adjusted basis of the asset at the time of retirement over the estimated salvage value or over the fair market value at the time of such retirement if greater, but only if -- (i) The retirement is an abnormal retirement, or (ii) The retirement is a normal retirement from a single asset account (but see paragraph (d) of this section for special rule for item accounts), or (iii) The retirement is a normal retirement from a multiple asset account in which the depreciation rate was based on the maximum expected life of the longest lived asset contained in the account. (4) Where an asset is retired by actual physical abandonment (as, for example, in the case of a building condemned as unfit for further occupancy or other use), loss will be recognized measured by the amount of the adjusted basis of the asset abandoned at the time of such abandonment. In order to qualify for the recognition of loss from physical abandonment, the intent of the taxpayer must be irrevocably to discard the asset so that it will neither be used again by him nor retrieved by him for sale, exchange, or other disposition. Experience with assets which have attained an exceptional or unusual age shall, with respect to similar assets, be disregarded in determining the maximum expected useful life of the longest lived asset in a multiple asset account. For example, if a manufacturer establishes a proper multiple asset account for 50 assets which are expected to have an average life of 30 years but which will remain useful to him for varying periods between 20 and 40 years, the maximum expected useful life will be 40 years, even though an occasional asset of this kind may last 60 years.
19. See First National Bank of Goodland, Kansas v. Commissioner, 5 B.T.A. 1174↩ (1927).
20. The relevant portion of section 263(a) provides: (a) General Rule.--No deduction shall be allowed for-- (1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate. * * *↩
21. We decide the excess compensation issue without determining that the payments were dividends to petitioners since we are precluded from finding dividend distributions as a result of respondent's inadequate showing of the earnings and profits of OEP. See Sterno Sales Corp. v. United States, 170 Ct. Cl. 506, 345 F.2d 552 (1965)and Gay Gibson Inc. v. United States, 207 Ct. Cl. 946 (1975) which discuss excessive compensation in the context of a corporate deduction under section 162↩.
22. As a result of viewing the sale and gift to Orange County as one transaction, petitioners thus transferred 53.3 acres for $ 212,500. On the 1973 partnership return of the Eastside Land Trust it was indicated that the partnership's bases in the sold and gifted properties were $ 106,635 and $ 103,081 respectively. According to these asserted bases it is apparent that a gain was realized by the partnership.↩
23. For the year 1973 section 1222(3) provided: The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing gross income. ↩
24. We attach great significance to the fact that petitioners' activities and not market appreciation contributed to the bulk of gain on the relevant property. In Buono v. Commissioner, 74 T.C. 187 (1980) we refrained from attaching significance to this factor. However, in Buono we dealt with whether the taxpayer's activities rose to the level of a trade or business. In the instant case petitioners' partnership was already engaged in the relevant business when the questioned transaction arose.
25. We note that in Adam v. Commissioner, 60 T.C. 996↩ (1973) the Court did consider the lack of improvements as a factor which pointed to the investment holding of property. Yet in tht case where an individual taxpayer sold nine properties it had not been established that the taxpayer was engaged in any type of real estate business and the Court viewed the lack of improvements as shedding light on whether the taxpayer was in a business at all. In the instant case petitioners were clearly in a real estate business which occasionally dealt with sales of unimproved realty.
26. The issues of petitioners entitlement to a charitable contribution deduction for the transfer to the church and the character of the gain on the sale to the church were first raised by respondent in an amended answer to the petition. Accordingly, respondent bears the burden of proof on both of these issues.↩
27. On its 1974 partnership income tax return, the Eastside Land Trust indicated that its bases in the sold and gifted properties were $ 14,040 and $ 3,944 respectively. In view of the parntership's receipt of $ 63,000 for the properties it is evident that the partnership realized a gain on the sale.
27. The relevant portions of section 333 provide: SEC. 333. ELECTION AS TO RECOGNITION OF GAIN IN CERTAIN LIQUIDATIONS. (a) General Rule.--In the case of property distributed in complete liquidation of a domestic corporation (other than a collapsible corporation to which section 341(a) applies), if-- (1) the liquidation is made in pursuance of a plan of liquidation adopted on or after June 22, 1954, and (2) the distribution is in complete cancellation or redemption of all the stock, and the transfer of all the property under the liquidation occurs within some one calendar month, then in the case of each qualified electing shareholder (as defined in subsection (c)) gain on the shares owned by him at the time of the adoption of the plan of liquidation shall be recognized only to the extent provided in subsections (e) and (f). (c) Qualified Electing Shareholders.--For purposes of this section, the term "qualified electing shareholder" means a shareholder (other than an excluded corporation) of any class of stock (hwether or not entitled to vote on the adoption of the plan of liquidation) who is a shareholder at the time of the adoption of such plan, and whose written election to have the benefits of subsection (a) has been made and filed in accordance with subsection (d), but-- (1) in the case of a shareholder other than a corporation, only if written elections have been so filed by shareholders (other than corporations) who at the time of the adoption of the plan of liquidation are owners of stock possessing at least 80 percent of the total combined voting power (exclusive of voting power possessed by stock owned by corporations) of all classes of stock entitled to vote on the adoption of such plan of liquidation; or (2) in the case of a shareholder which is a corporation, only if written elections have been so filed by corporate shareholders (other than an excluded corporation) which at the time of the adoption of such plan of liquidation are owners of stock possessing at least 80 percent of the total combined voting power (exclusive of voting power possessed by stock owned by an excluded corporation and by shareholders who are not corporations) of all classes of stock entitled to vote on the adoption of such plan of liquidation. (d) Making and Filing of Elections.--The written elections referred to in subsection (c) must be made and filed in such manner as to be not in contravention of regulations prescribed by the Secretary or his delegate. The filing must be within 30 days after the date of the adoption of the plan of liquidation. (e) Noncorporate Shareholders.--In the case of a qualified electing shareholder other than a corporation-- (1) there shall be recognized, and treated as a dividend, so much of the gain as is not in excess of his ratable share of the earnings and profits of the corporation accumulated after February 28, 1913, such earnings and profits to be determined as of the close of the month in which the transfer in liquidation occurred under subsection (a) (2), but without diminution by reason of distributions made during such month; but by including in the computation thereof all amounts accrued up to the date on which the transfer of all the property under the liquidation is completed; and (2) there shall be recognized, and treated as shortterm or long-term capital gain, as the case may be, so much of the remainder of the gain as is not in excess of the amount by which the value of that portion of the assets received by him which consists of money, or of stock or securities acquired by the corporation after December 31, 19538 exceeds his ratable share of such earnings and profits. 28. See Cohen v. Commissioner, 63 T.C. 527 (1975). In their petition, petitioners asserted that their election under section 333↩ was not valid. However at trial and on brief, they have apparently abandoned that position and direct their argument to the issue of the value of second mortgage notes received as a result of the liquidation. 29. It should be noted that the amount of Howell Hills earnings and profits on the date of liquidation does not appear in the record. However, the amount of its surplus ($ 64,207.51) is in the record. While the terms "earnings and profits" and "surplus" are not always synonymous, the parties have not framed this as an issue. It is thus evident that each parties' ratable share of earnings and profits is greater than the amount of cash received upon liquidation. Accordingly, respondent has asserted and petitioners have not denied that the gain on the liquidation is to be reported as dividend income. The issue for our determination is the amount of that gain.
30. In spite of their stipulation, at trial petitioners first introduced evidence of a legal settlement between the petitioners and Mr. Hollis Scott, an erstwhile shareholder of Howell Hills, wherein petitioners paid $ 31,726 for the surrender of Scott's stock in Howell Hills. Of this amount, $ 12,000 was allocated to the cost of the stock while the remainder was allocated to costs of litigation.Petitioners now argue that each petitioner is entitled to a $ 6,000 increase in the basis of this stock, as a result of the settlement. At trial it was held that the evidence profferred was untimely and we therefore have not considered it in our opinion. See footnote 8.
31. SEC. 6651. FAILURE TO FILE TAX RETURN OR TO PAY TAX. (a) Addition to the tax.--In case of failure-- (1) to file any return required under authority of subchapter A of chapter 61 (other than part III thereof), subchapter A of chapter 51 (relating to distilled spirits, wines, and beer), or of subchapter A of chapter 52 (relating to tobacco, cigars, cigarettes, and cigarette papers and tubes), or of subchapter A of chapter 53 (relating to machine guns and certain other firearms), on the date prescribed thereofre (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate. 32. SEC. 6651. FAILURE TO FILE TAX RETURN OR TO PAY TAX. (b) Penalty Imposed on Net Amount due.--For purposes of-- (1) subsection (a)(1), the amount of tax required to be shown on the return shall be reduced by the amount of any part of the tax which is paid on or before the date prescribed for payment of the tax and by the amount of any credit against the tax which may be claimed on the return, (2) subsection (a)(2), the amount of tax shown on the return shall, for purposes of computing the addition for any month, be reduced by the amount of any part of the tax which is paid on or before the beginning of such month and by the amount of any credit against the tax which may be claimed on the return, and (3) subsection (a)(3), the amount of tax stated in the notice and demand shall, for the purpose of computing the addition for any month, be reduced by the amount of any part of the tax which is paid before the beginning of such month.
33. SEC. 6653. FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard of Rules and Regulations With Respect to Income or Gift Taxes.--If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.↩